### K. Kay SHEARIN, Plaintiff,

v.

### The E.F. HUTTON GROUP, INC., a Delaware corporation, and E.F. Hutton & Company Inc., a Delaware corporation, and E.F. Hutton Trust Company, a Delaware corporation and, Shearson Lehman Hutton Inc., a Delaware corporation and, SLBP Merger Sub., Inc., a Delaware corporation, Defendants.

### Civ. A. No. 9861.

Court of Chancery of Delaware, New Castle County.

Submitted: March 1, 1994.
Decided: June 7, 1994.
Revised: Dec. 8, 1994.

---

4. This Court has corrected the caption *sua sponte.*

K. Kay Shearin, pro se plaintiff.

Anne C. Foster, Richards, Layton & Finger, Wilmington, for defendants.

## OPINION

ALLEN, Chancellor.

Pending is a motion to dismiss the complaint and a cross motion to amend the complaint to add new matters. The litigation arises out of a course of action leading to the March 1986 firing of plaintiff from her position as Legal Counsel and Vice President of E.F. Hutton Trust Company ("Hutton Trust"), a Delaware limited purpose trust company chartered under Title 5 of the Delaware Code.

This suit was filed in April 1988. It purports to allege four causes of action, each of which is explained below. The gist of the complaint is that Hutton Trust was used inappropriately (i.e., beyond its statutory powers and deceptively) by its parent E.F. Hutton Group, Inc. and its affiliate, E.F. Hutton, Inc., and that plaintiff sought to disclose this fact to the Hutton Trust board of directors. It is alleged that this stance made her very unpopular with senior management of Hutton Trust and legal officers of its affiliate. They tried, it is claimed, to force her to be silent, and when she would not be quiet these individuals defamed her by making false statements among themselves and to the Hutton Trust board, and by submitting an allegedly false document to regulators under her signature. As a result she was fired by Hutton Trust. She claims damages for defamation; for breach of her employment contract; and for interference with her contract of employment.

Unrelated to these central claims arising from the termination of her employment, plaintiff also seeks to assert rights of Hutton Group, Inc. shareholders arising out of a 1988 merger between Hutton Group, Inc., and a subsidiary of Shearson Lehman Brothers Holdings, Inc. That merger converted the Hutton Group stock holdings of all public shareholders into the right to receive cash or notes. Lastly, the motion to amend the complaint would add a confusing welter of allegations falling into six or seven theories of recovery including a claim to indemnification payments and for subornation of perjury.

\* \* \*

Ms. Shearin, who is a member of the bar of this State, started out to make a federal case of her firing. She sued Hutton Group, Hutton Trust and others in United States District Court for the District of Delaware, alleging that the operations of Hutton Trust constituted a racketeering enterprise in violation of the federal Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(a) (1970). The allegation in that action stated most simply was that Hutton Trust was a sham organization used to allow Hutton Inc. to charge its customers for both brokerage and trust administrative services, while having no trustee services actually performed by Hutton Trust. In her federal action plaintiff alleged that she was injured (her employment terminated) as a result of a conspiracy to operate this "racket."

This Court of Chancery action was stayed pending the outcome of the federal litigation. In that action the district court initially dismissed the complaint, holding that plaintiff had no standing to litigate the claim that charges to Hutton, Inc. and Hutton Trust's customers were excessive or fraudulent. The Court of Appeals for the Third Circuit reversed. *See* 885 F.2d 1162 (1989). Upon remand trial was held by the district court, after which the court found that plaintiff had not proven that defendants had formed a racketeering enterprise. The complaint was dismissed. The United States District Court apparently declined to rule on plaintiff's state law theories of recovery because defendant did not consent to a post trial amendment of the pleadings that the parties apparently thought necessary. I assume without deciding that the district court's election not to address these state law claims leaves these issues open for adjudication in this court.

The stay of this action was thereafter lifted. Defendants have moved to dismiss the complaint. I turn first to a description of the complaint as filed.

## I.

The complaint is structured around four purported "causes of action." **The first pur-**

*ported cause of action* alleges that in effect Hutton Trust was operated as a sham and that plaintiff was ultimately fired (and defamed) because she would not go along with it. More specifically it is alleged that:

1. Hutton, Inc.'s account executives would "set the fee for Hutton Trust's services" and hold "trust assets" at a Hutton, Inc. branch office; the account executive would accept additional contributions to the trust and make "whatever investments he chose" (¶ 12) and make distributions to the beneficiary, "all without authorization from the trustee...." (¶ 12) This was done with the concurrence of Hutton Trust's CEO. (¶ 13)

2. Plaintiff was ordered by Hutton Trust's CEO to "implement AE's (Hutton, Inc. account executive's) administrative decisions" but she refused, thinking to do so would violate Rules of Professional Conduct. (¶¶ 15–16) Instead she notified "Hutton Trust management." (¶ 16)

3. As a consequence certain individuals employed by Hutton, Inc. "defamed Plaintiff at diverse times by oral and written statements to third [unidentified] parties ... including Hutton Trust's Directors, that Plaintiff had indeed performed improper acts ... in administering the personal trusts." (¶ 16)

4. Because of these untrue allegations ... Hutton Trust's Board of Directors ratified (C.E.O.) Abbes's reduction of Plaintiff's compensation and then, on March 6, 1986, his termination of her employment...." (¶ 17)

5. "Plaintiff has no adequate remedy at law for the damages Defendants will continue to do to her professional reputation...." (¶ 20)

**The second purported cause of action** revisits the loss of employment and the alleged defamation. It alleges different facts, however. Under these pleadings (assuming their truth, as I do on this motion) one learns:

1. Ms. Shearin served as the Secretary to the investment committee of Hutton Trust. (¶¶ 22, 25)

2. Mr. Abbes (Hutton Trust's CEO) directed her to make corporate minutes "as

brief and as vague as possible" (¶ 26) even omitting [presumably material] matter (¶ 27) or changing minutes once they were approved. (¶ 28)

3. "After Plaintiff's memorandum to the Board of Directors dated 4 November 1985 ... Mr. Abbes forbade Plaintiff to communicate with Hutton's management." (¶ 29)

4. "When Plaintiff [nevertheless] continued to communicate with Hutton Trust's other Directors "she was advised by [other Hutton Trust & Hutton, Inc. officers] that such insubordination was grounds for termination of her employment. (¶ 30)

5. Hutton, Inc. employees told the Hutton Trust board that Plaintiff's refusal to accept Abbes's opinion as to her ethical responsibility was itself unethical. (¶ 32)

6. Mr. Bochat a member of Hutton, Inc.'s legal staff told Abbes that "Plaintiff could not raise issues of professional responsibility ... because she had accepted employment as an attorney [for the Trust Company] when she had not yet been admitted to the bar of Delaware." (¶ 33) This was incorrect and Mr. Bochat "must have known it." (¶ 34)

7. As a result Abbes "ordered Plaintiff on or about 30 January 1986 to stop acting as Trust Counsel and Corporate Secretary."

8. This constitutes defamation and interference with contractual relationship.

**The third purported cause of action** alleges that:

1. Mr. Abbes and Mr. Hitchcock "instructed Plaintiff to remove documents ... before bank examiners came ..." and not to talk to bank examiners except in the presence of Mr. Abbes or Mr. Hitchcock. (¶ 38)

2. Plaintiff refused. (¶ 39) But Mr. Abbes made "material misrepresentations to them ... making it appear that Plaintiff was a party to the fraud on bank examiners."

3. "Hutton" falsified the information above Plaintiff's signature on a Form U–4 (Uniform Application for Security Industry Registration or Transfer) and submitted

that forged form to securities' regulators...." (¶ 40)

4. Mr. Abbes and others "submitted to the United States District Court for the District of Columbia false information about Hutton Trust" (¶ 42) ... "it would have appeared that Plaintiff, as Hutton Trust's lawyer, was at least partly responsible for them...." (¶ 43)

5. "By making it appear that Plaintiff was a party to these misrepresentations.... Defendants portrayed Plaintiff in a false light that damaged her ... reputation and exposed her to legal liability." (¶ 44)

*The fourth purported cause of action* arises out of a proposed (since effectuated) merger between an affiliate of Shearson Lehman Brothers Holding, Inc. and Hutton Group, Inc. While the count contains none of the allegations necessary to plead a class action under Rule 23, it apparently is meant as a stockholders' (as opposed to derivative) action. The allegations are in summary as follows:

1. In January 1988 Shearson acquired 85.8% of Hutton Group, Inc.'s common stock in a public tender offer at $29.25 cash per share. (¶ 47)

2. The second step of this transaction is [was] to be a merger in which the remaining public shareholders of Hutton Group would [have] received $29.25 principal amount of Shearson's 10¾% senior subordinated notes.

3. "The real value of Hutton's shares is more than $29.25, but Shearson has been able to acquire shares at that price because *the trading price has been depressed by Hutton's legal liability for conduct alleged herein.*" (¶ 49) (emphasis added).

4. "Shearson will enjoy a windfall" (¶ 50) and "Plaintiff's ... shares will be converted at the merger price which is lower than their actual value." (¶ 51)

\* \* \* \* \* \*

Thus the complaint as alleged purports to assert claims of injury to reputation, of breach of employment contract and of inade-

quacy of merger consideration in the 1988 Shearson–Hutton merger. The complaint also seeks a declaratory judgment to the effect that plaintiff was not legally responsible for any of Hutton Trust's alleged improper activities.

For the reasons that follow I conclude (1) that the claims of defamation are barred by the applicable statute of limitations; (2) that the claim for breach of employment contract raises a litigable issue: whether Hutton Trust terminated plaintiff for her refusal to violate a code of professional conduct and if so whether such conduct violated an implied obligation of good faith and fair dealing; and (3) all the other claims attempted to be alleged in the complaint and in the proposed amended complaint, fail to state a claim and should therefore be dismissed.

## II. The Defamation Claim

■ I turn first to the claims of defamation or injury to reputation. The contention of defendants is that any purported defamation claims are barred by Section 8119 of Title 10 of the Delaware Code, which establishes a two year period of limitation for actions asserting personal injuries. I agree and thus will dismiss those claims.

■ First, I briefly address a preliminary conclusion concerning the applicability of statutes of limitations in equity. Where the legislature intends a statute of limitations to apply to a claim, a court of equity is, of course, constitutionally bound to respect that declaration of law. But there is a long and technically complex history within which to consider the question whether any legislative intent of this kind exists with respect to a claim that is equitable in nature. *See Kahn v. Seaboard Corp.,* Del.Ch., 625 A.2d 269 (1993). There seems little question, however, that a claim of defamation that finds its way into the Court of Chancery is a claim to which the statute of limitations will be applied. It is a "legal" claim that, using the traditional professional vocabulary, is part of Chancery's concurrent jurisdiction.[1] *See generally Heathergreen Commons Condo*

---

1. That is, it is a claim which could be brought at law *or* (if plaintiff asserts entitlement to an equitable remedy) in Chancery.

*Ass'n v. Paul,* Del.Ch., 503 A.2d 636, 645 (1985). The fact that plaintiff asks for an injunction against future possible defamations does not itself render the application, directly or analogously, of the appropriate statute of limitations inappropriate. A request for injunctive relief can get a defamation action into Chancery in the first place, but it does not alone justify the court in not applying the same limitations provision as would apply were the facts brought before the Superior Court.

\* \* \*

Two limitations statutes may arguably apply to a defamation action in this state: Section 8106 of Title 10 (3 year period) or Section 8119 (2 year period). Were this a matter of first impression arguments could be made in favor of the applicability of either statute (*see McNeill v. Tarumianz,* 138 F.Supp. 713 (D.Del.1956)). But the question is no longer open. In *DeMoss v. News-Journal Company,* Del.Supr., 408 A.2d 944 (1979) our Supreme Court held that an action for libel was governed by the two year period of Section 8119. Most of the communications alleged in this instance to be defamatory were spoken, not written, but that difference presents no principled basis to distinguish the *DeMoss* holding, which I conclude is applicable and binding.

This suit was filed on April 29, 1988 and I assume steps were taken to have the complaint served promptly. Thus April 29, 1988 is the relevant date to measure whether the statute, applied analogously or directly, precludes litigation of this claim. Ms. Shearin alleges that her employment was terminated on March 6, 1986. She alleges no communication or publication after that date (except ing ¶ 18) relevant to her defamation claims. Nor does she allege any facts that would constitute concealment or other factors staying application of the applicable statute. *See Kahn v. Seaboard Corp.,* 625 A.2d at 277.

In paragraph 18 of her complaint plaintiff alleges that on September 22, 1986 Hutton Group's Executive Vice President, "informed Plaintiff that they were considering whether Plaintiff's actions ... give rise to any claims on behalf of Hutton" and that "in addition we are examining your conduct in the context of the rules of ethics governing attorneys in the various jurisdictions in which you are admitted to practice law." While this communication did occur within two years of the filing of the complaint, it does not constitute any part of a defamation. Surely the quoted statement does not meet the definition of a defamatory communication proffered by the Restatement (Second) of Torts, § 559: communication is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

Thus I conclude that the theory of recovery that plaintiff seeks to present as the core of the complaint, of written and spoken defamation of plaintiff's character or professional capacity is barred by the applicable two year statute of limitations.

### III. The Claim for Declaratory Relief

■ Somewhat related to plaintiff's claim of defamation is a request for a declaratory adjudication that she was not culpably involved in any wrongdoing of Hutton Trust. This matter is apparently brought in anticipation of claims of fraud being asserted against Hutton Trust by its trust beneficiaries. Plaintiff also seeks a similar declaration with respect to any misrepresentation claims which might be brought against Hutton Trust by bank and securities regulators.

Insofar as the complaint's allegations show, however, the claims, which Ms. Shearin purports to fear, are entirely speculative. It is not alleged that any identified person has asserted or threatened to assert a claim against plaintiff or has even asserted or threatened a claim against Hutton Trust in which plaintiff could be implicated or her reputation besmirched.

Plaintiff's declaratory claim meets none of the tests for a declaratory judgment under 10 *Del.C.* § 6512. *See Schick v. ACTWU,* Del.Ch., 533 A.2d 1235, 1238 (1987). *See Stroud v. Milliken,* Del.Supr., 552 A.2d 476 (1989). The essential claim sought to be litigated is a *defense* to the claim of some hypothetical person injured by the conduct of Hutton Trust. Plaintiff wants an adjudica-

tion of her non-liability to persons neither present nor asserting that any liability exists. Moreover, plaintiff alleges no facts that show a present interest of hers is materially and adversely being affected by the current state of affairs with respect to litigation of Hutton's conduct. It is not, for example, alleged that identified clients of the Hutton Trust Company have threatened plaintiff with litigation or that she is otherwise operating under some disability due to the possible existence of claims against her by third parties. Even more basically since no such persons have been made parties to this litigation, even if the court were to undertake to adjudicate the questions of the involvement or lack of involvement of plaintiff in what she sees as violations of law, a final judgment confirming her position would certainly not be binding on absent Hutton Trust customers. *See, e.g.,* 18 Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure* § 4416 (1981). Thus, adjudication of the question of whether plaintiff was involved in violations of law leading to potential liability or other onerous present consequences, does not in this instance satisfy the most basic requirements of a declaratory judgment action. The claim must therefore be dismissed.

## IV. Breach of At Will Contract

 Plaintiff's contract of employment had no set term. It thus falls within that great group of employment contracts characterized in the law as "at will employment contracts." Such contracts, speaking quite broadly and generally, may be terminated by either party without demonstrating to anyone else's satisfaction that the reasons for doing so are valid, reasonable or appropriate.

### A.

The principle that employment contracts that are not for a stated term will be typically construed as "at will" in this sense is of modern origin. In the 17th and 18th centuries employers were generally privileged to terminate employment only when they had "just cause" to do so.[2] During the period

1870–1920, however, (that is during what I take to have been the high-tide of classical liberalism in political thought) the concept of socially implied obligations atrophied; growing acceptance of a conception of autonomous individuals explicitly determining the whole of their legal relationship through mutual consent, gave birth to the at will concept of employment contracts. *See* Feinman, *The Development of the Employment At Will Rule,* 20 Am.J.Legal Hist. 118 (1976). More recently in the 20th century in contract law, as elsewhere, one sees the gradual melting away of the glacier of classical liberalism and the re-emergence of "implied" (or socially imposed) obligations among contracting parties. *See, e.g.,* Grant Gilmore, *The Death of Contract* (1974); P.S. Atiyah, *The Rise and Fall of Freedom of Contract* (1979). Consistent with this trend, in employment termination cases courts appear increasingly to be willing to find in the facts of specific cases employer liability for terminating the employment of a person who had been hired on an "at will" basis. *See generally* Massingale, *At Will Employment: Going, Going ...,* 24 U.Rich.L.Rev. 187 (1990). Defendant's motion to dismiss the complaint requires some exploration of this development.

### B.

Interpreted in a way most favorable to the pleader, the complaint alleges that plaintiff was fired by her employer (1) because she refused to take actions that were ordered by her client "that would have been actionable breaches of the law and the Delaware Lawyers' Rules of Professional Conduct" (Cplt. ¶ 15) and (2) because she disclosed to the Hutton Trust management her views of the inappropriateness of the way in which Hutton Trust facilitated Hutton Inc.'s business, which she claims to have a professional obligation to do. (Cplt. ¶ 16)

Therefore, the complaint, read sympathetically to plaintiff, raises the question whether there is in this jurisdiction an implied term in an "at will" employment contract to the effect that the employer will not exercise its legal power to terminate employment in re-

---

**2.** The English Statute of Laborers of 1562 was a legislative reflection of this early rule. *See* Com-

ment, *Understanding the Just Cause Defense,* 65 U.Det.L.Rev. 527, 531 (1988).

taliation for conduct that is required by (or prohibited by) the established professional obligations of a professional employee? If the answer to that question is yes, then further questions of fact and law arise: was plaintiff's firing retaliatory in that sense; did her employer believe in good faith that plaintiff had no professional obligation to take the actions that triggered her termination; if the employer had such a good faith view, what is the legal consequence of such belief if, *ex post*, it is determined to be incorrect. Questions of this type are, in part, factual and therefore not resolvable on a motion to dismiss. The preliminary questions however are legal: is there in Delaware any implied limitation on an employer's right to fire an at will employee and if so does any such limitation reach the facts pleaded?

## C.

In recent years, the rule that an employment contract for an unspecified term may be terminated by either party, with or without cause, has been modified in many jurisdictions. More than ten years ago it was reported that the highest courts of thirty six jurisdictions had addressed challenges to the at will employment concept and twenty five of those have "either modified the at will rule or shown the courts' willingness to do so in the future." Note, *Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exceptions*, 96 Harv.L.Rev. 1931 (1983). This trend towards imposing constraints on an expansive interpretation of employers' prerogatives under at will employment contracts has continued. *See* Note, *Determining Just Cause*, 66 Wash.L.Rev. 831 (1991).

In modifying the traditional doctrine courts have either adopted what might be called a contractual basis or a public policy basis to find the limitation that they have enforced. The contractual basis takes the form of an implied promise arising from the circumstances of the relationships,[3] or of an implied covenant of good faith and fair dealing.[4] Tenure in this sense means protection against discharge without justification, which may itself exist either from the employee's job performance or conduct or from general economic circumstances confronting the employer.

Alternatively to finding by implication a restriction on the unfettered right to discharge an at will employee in the contract itself, is a tort style analysis employed by some courts. This approach recognizes a claim for wrongful termination predicated on the protection of specific articulated public policy. That is, these cases recognize a duty on the part of an employer to refrain from firing an employee for reasons that would contravene such well articulated public policy.[5]

The law of Delaware with respect to any implied limitation upon the exercise of a right to terminate the employment of an at will employee is not well developed. We are, however, not left without guidance on this question. In *Merrill v. Crothall–American, Inc.*, Del.Supr., 606 A.2d 96 (1992) the Delaware Supreme Court recognized that even at will employment contracts do contain an implied covenant of good faith and fair dealing. In *Merrill* the Court equated breach of that covenant with an act of "fraud, deceit or misrepresentation...." "The lodestar is candor," we are told. 606 A.2d at 101. In *Merrill* the Court held that a corporation that hired an employee knowing the employ-

---

**3.** *See, e.g., Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982); *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980).

**4.** *Cleary v. American Airlines, Inc.*, 111 Cal. App.3d 443, 168 Cal.Rptr. 722, 729 (1980); *Fortune v. National Cash Register*, 373 Mass. 96, 364 N.E.2d 1251 (1977).

**5.** *See, e.g., Magnan v. Anaconda Industries, Inc.*, 37 Conn.Supp. 38, 429 A.2d 492 (1980) (valid cause of action when employee terminated for

refusing to sign a false statement concerning a crime); *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (valid cause of action when employee terminated for refusing to participate in a criminal price-fixing scheme); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974) (employee has a valid claim for breach of contract when dismissed for refusing to date foreman). *But see Martin v. Tapley*, Ala.Supr., 360 So.2d 708 (1978); *Segal v. Arrow Industrial Corp.*, Fla.App., 364 So.2d 89 (1978).

ment to be temporary but not disclosing that fact, violated an implied covenant of good faith when it terminated his employment without justification.

No Delaware State court has been required to opine with respect to the existence, absent express negotiation on the subject, of implied terms in an at will employment contract between a corporation and a professional (licensed) person. A recent decision of the Supreme Court of New Jersey offers helpful guidance. In *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), a physician who was employed by a pharmaceutical company, as a scientific researcher, was fired for refusing to perform additional research using a drug that contained saccharine. The researcher claimed that doing so would violate her obligation under the Hippocratic Oath to do no harm to other humans.

In addressing this claim on summary judgment, the court first asked whether New Jersey law privileges an employee's refusal to violate a code of professional ethics. The court reasoned that the law would protect to some extent an employee who upheld a legally significant professional standard against attempted invasion. It stated:

> Employees who are professionals owe a special duty to abide not only by federal and state law, but also by the recognized codes of ethics of their professions. That duty may oblige them to decline to perform acts required by their employers. However, an employee should not have the right to prevent his or her employer from pursuing its business because the employee perceives that a particular decision violates the employee's personal morals, as distinguished from the recognized code of ethics of an employee's profession. *Pierce*, 417 A.2d at 512.

Concerned not to create too broad a restriction on employer freedom of contract, the court also found that only those codes of ethics that express a clear mandate of public policy (and were not merely created to "serve the interests of a profession" or were merely "concerned with technical matters") would fit within this exception. *See id.* at 512.[6]

The court then analyzed the factual question whether plaintiff was terminated for refusing to violate a clear mandate of public policy. The New Jersey Supreme Court reasoned, in essence, that the public policy surrounding drug research was embodied in the FDA regulatory regime, which the company was following. This being the case, the plaintiff was seen as asserting a right to be protected against termination because she had acted in accordance with her conscience. Such a claim, the court reasoned, could not be upheld:

> Viewing the matter most favorably to Dr. Pierce, the controversy at Ortho involved a difference in medical opinions. Dr. Pierce acknowledged that Dr. Pasquale was entitled to his opinion that the oath did not forbid work on loperamide. Nonetheless, implicit in Dr. Pierce's position is the contention that Dr. Pasquale and Ortho were obliged to accept her opinion. Dr. Pierce contends, in effect, that Ortho should have stopped research on loperamide because of her opinion about the controversial nature of the drug ... Under her theory, a professional employee could redetermine the propriety of a research project even if the research did not involve a violation of a clear mandate of public policy. *Id.* at 513–14.

The *Pierce* opinion underscores a limiting principle reflected in other judicial opinions: employees who seek protection from firing on the basis that their actions were protected by a public policy, must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position with responsibility

---

6. On this point, a later N.J. Superior Court decision applying *Pierce* is pertinent. In *Warthen v. Toms River Community Mem. Hosp.*, 199 N.J.Super. 18, 488 A.2d 229 (1985) a nurse refused to dialyze a terminally ill patient, and was fired for so refusing. The nurse contended that her termination violated the public policy mandate embodied in the Code for Nursing. The pertinent provision stated that a nurse could refuse to participate in a procedure if personally opposed to it. The court held that this provision "defines a standard of conduct beneficial only to the individual nurse and not to the public at large." Thus, the public policy exception was found to be inapplicable.

for that particular interest.[7] For example, in *Geary v. United States Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974), a salesman at a steel company protested the sale of a product that he considered to be unsafe. Having being ordered to "follow directions" by his immediate superiors, he took his protests to senior corporate officers. Ultimately, he was fired for not following orders. The Pennsylvania Supreme Court refused to afford him judicial relief in his suit for wrongful discharge. In rejecting the applicability of the public policy exception to the at will doctrine, it relied principally on the fact that the plaintiff's duties as an employee did not extend to matters of product safety. Thus, in the opinion of the Pennsylvania Court, no clear public policy concern was implicated in this termination.[8]

### D.

This case only requires an opinion with respect to the discharge of Ms. Shearin, who was employed as a licensed professional and who claims that the action for which she was discharged was required (in the case of her communications to the Hutton Trust board) or prohibited (in the case of certain other conduct) by her obligation under the Delaware Rules of Professional Conduct. As the corporation's legal counsel she had primary responsibility for corporate compliance with legal obligations in connection with matters upon which she worked. In this respect, she was prohibited, under Rule 1.2 from assisting her client, Hutton Trust, from engaging in any conduct she knew was "criminal or fraudulent." Thus, accepting her view of the facts, her refusal to be a part of what she asserts were material misrepresentations to bank and securities regulators was arguably required by the Rules. The Rules of Professional Conduct also read on her decision to report perceived breaches of legal duty to

the Hutton Trust management. Rule 1.13(b) provides guidance to lawyers who have an organization as a client. It provides, in pertinent part:

> If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization.

The maintenance of established codes of ethical behavior by licensed professionals is of immense social value. Every client of an attorney, including corporate employers, must be taken to understand that professional services rendered by that attorney, whether as an employee or as an independent professional, must be fully in conformity with the Rules of Professional Conduct promulgated by appropriate agencies, in this State by the Delaware Supreme Court. That understanding must be deemed to be an implicit term of every lawyer's contract of retention or of employment. The role of lawyers in the operation of the legal and regulatory system is too vital to the achievement of the public good for the law to countenance with equanimity the exertion of powerful economic pressure to violate the ethical duties of a lawyer; the ability of an employer to fire a regularly employed professional who refuses to violate those rules is, of course, just such a powerful pressure.

I know not where the truth of the matters alleged lie. But construing the complaint broadly in favor of the pleading, as is required on a motion to dismiss, and ignoring

---

7. *See, e.g., Lee v. Denro*, 91 Md.App. 822, 605 A.2d 1017, 1024 (1992) ("where ... there is no affirmative direction by an employer that an employee violate a recognized public policy and the employee contravenes normal operating procedures in airing his or her grievances, an employer is free to discharge that employee at will.")

8. *Sheets v. Teddy's Frosted Foods*, 179 Conn. 471, 427 A.2d 385 (1980) is a case where plaintiff

satisfied these requirements. Plaintiff was a quality control director at a frozen food products company. He alleged that he was discharged for identifying deviations from the employer's own standards, as well as pointing out false labels, which violated the Connecticut Uniform Food, Drug and Cosmetic Act. The court found that plaintiff had stated a valid claim for wrongful discharge.

any question of possible defenses at this juncture,[9] I cannot now conclude that plaintiff has failed to state a claim for breach of her contract of employment.[10]

Finally, defendants contention that this claim is barred by the one-year limitation period applicable to claims arising out of an employment relationship is erroneous. The Supreme Court in *Goldman v. Braunstein's, Inc.*, Del.Supr., 240 A.2d 577, 578 (1968) held that actions based upon a claim for wrongful termination of an employment contract are governed by the three-year limitations period of Section 8106.

## V. Interference with Contractual Relations

■ The complaint alleges that employees of Hutton Inc. made statements to the Hutton Trust board of directors concerning Ms. Shearin that caused her to be fired.[11] These statements, it is alleged, were defamatory and influenced the decision to terminate her employment. Because the individuals who made these statements were agents of Hutton Inc., Hutton Inc. is alleged to be liable in tort for interference with plaintiff's contract of employment.

On their motion to dismiss the Hutton defendants assert these allegations fail to state a claim because an affiliated entity cannot be liable in tort for interfering with a contract between its affiliate and a third party. I agree that plaintiff has failed to allege facts that overcome a privilege that firms affiliated through common ownership have to discuss and, within the law, act upon courses of action designed to achieve their legitimate business interests.

\*　　\*　　\*

■ The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable "improper" intentional interference with the promisor's performance.[12] Such protection is, in our competitive market economy, itself somewhat problematic. Plainly, this form of liability may have the effect of chilling third parties from vigorously competing for business in any marketplace in which existing contracts obtain. Mindful of this risk, courts have tended to narrowly circumscribe the scope of this tort. *See Irwin & Leighton v. W.M. Anderson Co.*, Del.Ch., 532 A.2d 983 (1987). Like the broader tort intentional interference with prospective economic advantage, this tort "inevitably involve[s] a complex normative judgment relating to justification.... The normative judgment whether pursuit of self interest justifies one in inducing another to breach a contract in particular circumstances ... inevitably involves an evaluation of many factors" *id.* at 992. *See* Restatement (Second) of Torts, Section 767 (1979).

In determining whether an interference with contractual relations is "improper", the Restatement (Second) of Torts identifies the following factors:

---

9. In determining this motion to dismiss I do not, of course, address questions of defense. For example, I do not address the question whether or not a good faith, reasonable dispute between an employer and a professional employee with respect to the requirement of applicable codes of ethics would constitute an affirmative defense in an action growing out of the employee's termination for refusal to follow a supervisors directions within his or her responsibility. *See, e.g., Waters v. Churchill*, —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (City Hospital could fire a nurse who criticized its programs if it reasonably believed its action did not violate first amendment, even if this belief turns out to have been incorrect).

10. Questions of an appropriate measure of damage for breach of an at will employment contract are not appropriate on a motion to dismiss but I note that classically nominal damages were available on contract claims (i.e., damage was not an element of the claim).

11. The alleged defamatory statements include assertions that plaintiff had acted "improperly" in administering the trust, (Cplt. ¶ 16), and that she had violated the Rules of Professional Conduct by accepting employment prior to having been admitted to the Delaware Bar. Cplt. ¶ 33. Plaintiff also alleges "Hutton Trust's Directors [were told] that her refusal to accept Mr. Abbe's opinion as to her ethical responsibility [that she should not communicate any further with Hutton Trust management] was itself an ethical breach." Cplt. ¶ 32.

12. *See Irwin & Leighton v. W.M. Anderson Co.*, Del.Ch., 532 A.2d 983 (1987); *Bowl–Mor Co. Inc. v. Brunswick Corp.*, Del.Ch., 297 A.2d 61 (1972). The elements of such a claim are set forth in the *Irwin v. Leighton* opinion.

(a) the nature of the actor's conduct;

(b) the actor's motive;

(c) the interests of the others with which the actor's conduct interferes;

(d) the interests sought to be advanced by the actor;

(e) the social interests in protecting the freedom of action of the actor and the connectual interest of the other;

(f) the proximity or remoteness of the actor's conduct to the interference;

(g) the relations between the parties.

Restatement (Second) of Torts, § 767 (1979).

\* \* \*

■ It is rudimentary that a party to a contract cannot be liable both for breach of that contract and for inducing that breach. By slight extension it has been held that employees (*Avins v. Moll*, 610 F.Supp. 308 (E.D.Pa.1984) *aff'd* 774 F.2d 1150 (3rd Cir. 1985)) or directors (*Local Union 42 v. Absolute Environmental Services*, 814 F.Supp. 392 (D.Del.1993)) of a contracting corporation cannot be held personally liable for inducing a breach of contract by their corporations when they act within their role. The complaint in this case seeks to hold liable not an employee or director but an affiliate of Hutton Trust. Thus, the pending motion raises the question whether an affiliate is privileged to confer with a contracting party with respect to its performance of its contractual obligations.

The question whether such a privilege for affiliates exists has been addressed, insofar as our research discloses, only when the "affiliation" is that of parent and subsidiary corporation. In these cases, courts have recognized the common economic interests between the two entities and have afforded them great latitude for discussion and joint decision making. In doing so, courts have relied on two principal theories.

The first theory relies on an agency concept. According to this theory, a parent and its wholly owned subsidiaries constitute a single economic unit. Reasoning from this premise and acknowledging that an entity cannot be liable for interfering with its own performance of a contract, these courts conclude that a parent cannot be liable for interfering with the performance of a wholly owned subsidiary. *See, e.g., American Medical International, Inc. v. Guirintano*, Tex. App., 821 S.W.2d 331 (1991) (holding that antitrust immunity of parent for conspiring to restrain trade with subsidiary is applicable to claim for interference with contract). Under this theory, "interference" by a parent in the performance of contractual obligations of its wholly owned subsidiary, no matter how aggressive, is not actionable.

The second theory that has been applied in this setting employs a balancing test of the kind elaborated in the Restatement (Second) of Torts. Courts adopting this second approach recognize the significant economic interest of a parent corporation in its subsidiary. They acknowledge a qualified privilege for protecting that interest. The privilege arises when the parent pursues lawful action in the good faith pursuit of its profit making activities. Thus, courts have found that "interference" based upon a parent corporation's belief that an agreement was economically unwise was held to be privileged. *See Green v. Interstate United Management Services Corp.*, 748 F.2d 827, 831 (3d Cir.1984). *See also Advent Systems, Ltd. v. Unisys Corp.*, 925 F.2d 670 (3d. Cir.1991) (applying this principle to a parent's interference with prospective contract of a subsidiary).[13]

The allegations of the complaint, if believed, establish that Hutton Inc. is an affiliated entity of Hutton Trust, the party alleged to have breached its contract.[14] In

---

**13.** In my opinion, this latter theory is more consistent with the traditional respect accorded to the corporate form by Delaware law. *See, e.g., Pauley Petroleum, Inc., et al. v. Continental Oil*, Del.Ch., 231 A.2d 450 (1967) *aff'd* Del.Supr., 239 A.2d 629 (1968). The "limited privilege" theory is consistent with this in that it does not ignore that a parent and a subsidiary are separate entities. Rather, it recognizes that the close economic relationship of related entities requires enhanced latitude in defining what "improper" interactions would be.

**14.** In my opinion, the relationship among wholly owned affiliates with a common parent is no different, insofar as is relevant here, than that between a parent and a subsidiary. Such entities share the commonality of economic interests

these circumstances, the burden should fall on the plaintiff to plead and prove that the privilege among affiliates to discuss and recommend action is not applicable or, stated affirmatively, to allege facts that would make the "interference" improper.[15] *See, e.g., Hi-Tek Consulting Serv. v. Bar–Nahum*, 218 Ill.App.3d 836, 161 Ill.Dec. 347, 578 N.E.2d 993 (1991). Such a showing would, for example, be satisfied by allegations that the interference was motivated by some malicious or other bad faith purpose.

■ Thus, the gist of a well-pleaded complaint for interference by a corporation of a contract of its affiliate is a claim that the "interfering" party was not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises. If one is privileged by reason of a recognized relationship to discuss the financial welfare of an affiliated party, one may in good faith suggest that a termination of a contract, and the assumption of any resulting liability, would be beneficial to that party. Thus, in my opinion, where corporations affiliated through joint ownership confer with respect to a contract to which one of them is party and a breach of that contract follows, there can be no noncontractual liability to the affiliated corporation, which is privileged to consult and counsel with its affiliates, unless the plaintiff pleads and proves that the affiliate sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure plaintiff.

In applying this principle here I note that most of the allegations that plaintiff makes concerning alleged statements by Hutton Inc. agents are expressions of opinion [16] (i.e., Cplt. ¶¶ 32, 34), but in one respect (¶ 16) they might include statements of fact. In all

events, plaintiff has not alleged that Hutton Inc.'s agent were not acting in good faith pursuant of the interests of the affiliated Hutton entities when they made those statements. This, in my opinion, is her burden in these circumstances.

Therefore plaintiff's complaint fails to state a claim for interference by Hutton, Inc. with her employment contract with Hutton Trust.

## VI. The Merger Claim

With respect to her fourth purported claim—the shareholders merger claim—plaintiff's complaint is inartfully drafted. Two theories might arguably support a cause-of-action arising from the merger with Shearson.

### A. The waste theory

■ In her brief, plaintiff claims to be asserting a claim for waste against the officers and directors of Hutton Group, which waste caused the consideration received in the merger with Shearson to be lower than it would otherwise have been. If this is her claim, it plainly fails on the grounds that plaintiff lacks standing to raise it. A claim for corporate waste is classically derivative, in that it asserts a harm suffered directly by the corporation and proportionally by all shareholders derivatively. While the successor corporation of a merged entity succeeds to any corporate claims owned by the predecessor entities, including claims of waste, shareholders cashed out in a merger no longer have standing to bring such a claim on the corporation's behalf. *See Kramer v. Western Pacific Indus., Inc.*, Del.Supr., 546 A.2d 348 (1988); *Bokat v. Getty Oil Company*, Del. Supr., 262 A.2d 246, 250 (1970). Thus, since

which underlay the creation of an interference privilege. At least one court has recognized, in dicta, that this privilege applies to affiliated entities. *See Heil–Quaker Corp. v. Mischer Corp.*, Tex.App., 863 S.W.2d 210, 215 (1993).

15. This is a particularized application of the Second Restatement's requirement that a plaintiff must prove that a third party's interference was "improper." It follows from this that a plaintiff must plead facts sufficient to support the inference that an interference was not proper. In the context of a claim against affiliated entities, this amounts to pleading that the limited privilege to

intervene in the activities of an affiliate is not applicable.

16. According to the Restatement (Second) of Torts, § 566 a defamatory communication in the form of an opinion is not actionable unless it implies the allegation of undisclosed defamatory facts as the basis for the opinion. Most of the statements allegedly made about plaintiff make normative judgments about actions which, it is undisputed, plaintiff took. To this extent, no valid defamation claim has been stated.

plaintiff only received notes of Shearson in their merger, she lacks standing to assert this derivative claim.[17]

### B. The fair price theory

#### (1) *Hutton's merger with Shearson*

I need first to explain briefly the nature of the transaction challenged, and the procedural setting in which this fourth purported claim is raised. The transaction challenged was the second step of a two-tiered cash-out merger negotiated by the representatives of Hutton Group and of Shearson Lehman Brothers Holdings. The deal agreed upon contemplated that the first step would be a tender offer by Shearson for a controlling interest in Hutton stock, at a price of $29.25 per share. The second step involved a merger of the Hutton Group into a Shearson subsidiary, in which the Hutton Group shareholders would receive senior subordinated notes of Shearson in the principal amount of $29.25. Hutton Group shareholders challenged this agreement, raising claims on behalf of all record holders of Hutton stock under Chancery Court Rule 23, and asserting additional derivative claims of the corporation under Rule 23.1. The complaint alleged breaches of the duty of candor, and also charged the defendants with breach of fiduciary duty in negotiating and approving a coercive transaction unfair to the Hutton shareholders.

These claims—i.e., at least all claims arising from the first step tender offer—were settled, however, via an agreement approved by the court on August 18, 1988. *See Rosen et al. v. The E.F. Hutton Group,* Del.Ch., C.A. No. 9467, *Order and Final Judgment,* Hartnett, V.C. (Aug. 18, 1988). The settlement order by this court dismissed with prejudice, all claims raised or which could have been raised in the shareholder action, which arose out of the same nucleus of underlying facts. The order, however, specifically excluded from this bar "dissenters' rights of appraisal under Section 262 of the Delaware

General Corporation Law." *See Rosen, supra* at 4.

#### (2) *Plaintiff's fair price claim*

The heart of the claim asserted is that the consideration for the merger was fixed by reference to the market price for Hutton Group stock which did not reflect the fair value of Hutton Group's assets. That is, plaintiff asserts that at the time of the fixing of the merger consideration, the market valuation of the Hutton Group stock was depressed by risk of lawsuits being brought against the Hutton entities arising from Hutton Inc.'s and Hutton Trust's breaches of fiduciary duties and misrepresentations in which they allegedly engaged. Thus, it is claimed that the merger consideration was not based upon an accurate valuation of the Group's assets, and was itself unfair. For the reasons that follow, I conclude that these allegations fail to state a claim, and should therefore be dismissed.

Without regard to how the transaction at issue was negotiated, plaintiff's sole complaint is that the price she received in the cash-out merger did not represent a fair valuation of her shares. More pertinently, it is not alleged that the merger negotiation was, in some way material to the consideration received by the shareholders, procedurally unfair. When the only basis for a minority shareholder's claim is that the price offered did not reflect a fair valuation of the corporation's assets, this claim may only be brought in an appraisal proceeding pursuant to the requirements of Section 262. *See Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099 (1985); *Ronald Porter v. Texas Commerce Bancshares,* Del. Ch., C.A. No. 9114, 1989 WL 120358, Allen, C. (Oct. 12, 1989).

The complaint here alleges no procedural defect in the course of the merger or other non-price related basis for an injunction or other equitable remedy. Under these cir-

---

**17.** I note as inapposite *In Re Tri–Star Pictures, Inc., Litig.,* Del.Supr., 634 A.2d 319 (1993) where the Court held that waste claims arising from actions of a controlling shareholder standing on both sides of a merger were not derivative, because the minority shareholders suffered harm

not incurred by the controlling person. Plainly, such is not the case here. Furthermore, I note that the other exceptions to this rule which the Supreme Court has previously recognized are also inapplicable. *See Bokat v. Getty Oil Company,* Del.Supr., 262 A.2d 246, 250 (1970).

cumstances, plaintiff's only remedy would be to assert her claim in a petition for appraisal. The complaint, however, does not allege that plaintiff has satisfied the prerequisites of such an action.[18] For this reason, the complaint in this respect fails to state a claim, and must be dismissed.

## VII. The Motion For Leave to Amend

Plaintiff seeks to amend her complaint to add certain additional matters. As these matters fail to state a claim upon which relief could be granted and would therefore be dismissed, I will deny the motion to amend.

### A. The Claim For Indemnification of Legal Expenses

■ In the amended complaint that plaintiff seeks leave to file Ms. Shearin asserts that Hutton Trust's bylaws [19] entitle her to indemnification for costs and expenses incurred in "litigation arising from her activities as an officer of Hutton Trust." (*See* Proposed Amended Cplt. ¶ 61). As pleaded this claim encompasses claims of indemnification for (1) expenses incurred in the concluded federal litigation; (2) expenses of this litigation already incurred; and (3) advancements of funds required to continue this suit in Chancery. Plaintiff has quantified only the expenses deriving from the federal litigation at $32,438.74 in counsel fees; she further asserts that she has already incurred "several thousand dollars" in other costs and expenses in all litigation against Hutton.

Commentators and jurists alike have noted the salutary effect of the indemnification pro-

visions in encouraging capable individuals to serve as officers and directors of corporations. *E.g.*, *Mooney v. Willys–Overland Motors, Inc.*, 204 F.2d 888, 898 (3d Cir.1953); *Essential Enters. Corp. v. Automatic Steel Prods., Inc.*, Del.Ch., 164 A.2d 437, 441 (1960). Section 145 of the Delaware General Corporation Law creates a framework [20] for the indemnification of corporate officers, directors and employees.

■ When questions of entitlement to indemnification payments under Section 145 are proposed in all instances the first inquiry that must be made is whether the expense incurred (or to be incurred) has been incurred in connection with a covered proceeding. A covered proceeding is a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative to which a claimant was made a party or is threatened to be made a party, "by reason of the fact that he is or was a director, officer, employee or agent of the corporation...." 8 *Del.C.* § 145(a). Thus the first requirement for indemnification under Section 145 is that the expenses in question be incurred in connection with a covered proceeding as described in subsection (a) or (b) of Section 145.

Section 145(c) provides that indemnification of expenses reasonably and actually incurred in connection with such a covered proceeding are mandatory "to the extent that a director, officer ... has been successful on the merits or otherwise in defense ... of that proceeding." 8 *Del.C.* § 145(c).

---

**18.** For example, the complaint does not allege that plaintiff voted against the merger, *see* Section 262(a), or submitted a demand for appraisal at the time of the merger, *see* Section 262(d).

**19.** The proposed amended complaint does not actually allege what the specific language of the bylaws provides. I assume, in plaintiff's favor that the Hutton Trust bylaws mandate indemnification payments to the full extent permissible under Section 145 of the Delaware General Corporate Law.

**20.** At least one set of knowledgeable commentators has noted the interrelationship of various methods of securing the interests of corporate directors and officers in reducing the risk of personal liability associated with serving a corporation. *See* E. Norman Veasey et al., *Delaware*

*Supports Directors with a Three–Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus.Law. 399 (1987). The authors note that the Delaware Code permits the limitation of director liability with the inclusion of Section 102(b)(7) of the General Corporation Law as the first "leg," indemnification as discussed here constitutes the second "leg" of such protection, while director insurance under Section 145(g) rounds out the scheme. Other writers have similarly noted the inclusion of Sections 102(b)(7) and 145 as responses to the upsurge in takeover-merger activity during the 1980s and the need for qualified outside directors on public boards. *See* David A. Drexler, et al., *Delaware Corporation Law and Practice* § 16.01 (1993).

To the extent (as in this instance) a claimant has not been successful "on the merits or otherwise," she may still be entitled to indemnification of expense incurred in a covered proceeding, if a disinterested quorum of the board, or legal counsel at the request of the board, or the shareholders, specifically determines (if the indemnification is sought in respect to a civil matter) that the proceeding was a covered proceeding, as described above and that the claimant "acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the corporation." *See* 8 *Del.C.* § 145(d).

\* \* \*

A review of the history of the statutory language of Section 145 confirms that the drafters of the statute originally had in mind indemnification of expenses for those who were required to *defend* actions taken on behalf of the corporation. Amendment of subsections (a) and (b) enacted as part of the 1967 comprehensive amendment of the Delaware General Corporation Law, however, have been held to broaden the reach of those subsections. In *Hibbert v. Hollywood Park, Inc.*, Del.Supr., 457 A.2d 339 (1983) the Supreme Court held that corporate directors who had *initiated* a lawsuit in their own names, against other directors were entitled to be indemnified for expenses incurred in that litigation. In *Hibbert*, one group of directors brought two suits against an adverse group of directors, seeking to compel defendants to attend board meetings and make proper disclosure in proxy statements in a control contest. The suits were both unsuccessful. The plaintiff-directors then sought indemnification for their legal expenses. In granting this request, the court gave considerable weight to the fact that the plaintiff-directors brought suit, at least in part, to fulfill their own fiduciary obligation to the corporation:

> We cannot say that such litigation was entirely initiated without regard to any duty the plaintiffs might have had as di-

rectors. In short, those lawsuits served, as we see it, to uphold the plaintiffs' honesty and integrity as directors.

*See Hibbert, supra* at 344.

While I find no other reported or unreported case in which a claimant to indemnification who initiated a suit against the corporation has been held entitled to indemnification from the corporation, no other case is necessary to establish the proposition, in Delaware, that a plaintiff may in proper circumstances be entitled to indemnification.

In all events, whether the claimant was a plaintiff or defendant, it is necessary to determine, as an initial matter, if their expenses claimed were incurred in connection with a covered proceeding as described above. In my opinion when the claimant was a plaintiff, as here, that question can be answered in the affirmative only when that suit was brought as part of the claimant's duties to the corporation.

■ Thus, I take *Hibbert* to recognize that permissible indemnification claims will include those deriving from lawsuits brought by directors, officers, agents, etc., *only insofar as the suit was brought as part of the employee's duties to the corporation and its shareholders*. The suits brought by Ms. Shearin, both in federal court and in the Court of Chancery, cannot be considered a manifestation of her responsibilities to Hutton Trust.[21] These suits plainly sought to advance her own interest, not the interest of the corporation. More specifically, the Chancery litigation involves purely the assertion of plaintiff's personal rights (i.e., defamation, breach of contract), and thus advances no interest of, or duty to, Hutton. Although plaintiff brought her federal claims under the RICO statute, and the claim therefore arguably implicated the policy concerns of that statute,[22] this does not bear on the question whether it sought to achieve, through litigation, a corporate benefit that it was plaintiff's duty to seek to achieve. Given that none of

---

**21.** For one thing, at the time of initiation of these suits she was no longer an employee, and thus had no authority to act for Hutton Trust and no on-going responsibilities to it.

**22.** 18 U.S.C. § 1962(c) creates a private right of action for any person injured in his business or property by reason of the activities of a racket, under the statute. The statute provides a right to treble damages, including a reasonable attorney's fee, to successful plaintiffs.

Shearin's claims are in any part motivated by a fiduciary or other obligation to the corporation from which she seeks indemnification, her demand that the corporation bear her expenses is without merit. The motion to add this claim at this date will therefore be denied.

### B. The Claim for Subornation of Perjury or Prima Facie Tort

Plaintiff seeks to amend her complaint to allege that Mr. Abbes, Hutton Trust's CEO perjured himself in the federal litigation. While plaintiff seeks to characterize this allegation as civil rather than criminal, the distinction is unimportant for our purpose. It is quite settled law that false swearing in one court cannot be the predicate for civil liability in another. The integrity of the judicial process requires that witnesses be assured that their testimony, which in all events will be subject to cross examination and possibly criminal sanction if knowingly false, cannot be the subject of a later attack through civil litigation. Thus as one conventional authority states the matter:

> As a general rule, no civil action lies for damages resulting from false statements under oath constituting perjury or from subornation of false statements.

60A Am.Jur.2d *Perjury* § 132 and cases at n. 14 (1988). Thus such a proposed claim would fail to state a claim upon which relief could be given.

### C. The Claim for Invasion of Privacy

Plaintiff seeks to add a claim for damages arising from her alleged portrayal in a false light. She says that Hutton Trust involved her in 1984 in some way that she did not know about then or specify now, in the Iran–Contra matter and then in 1987 misinterpreted her communications to Hutton after she was fired as a possible attempt at extortion by her. All of this is said to have held her out (to whom she does not allege) in a false light to her damage.

I pass over the question whether the assertion of such a claim now is barred by limitations or relates back to the original filing (Cplt. ¶ 18), because I can only conclude that this attempt to state a claim fails. The essence of a claim for the tort of being shown in a false light is an invasion of one's privacy, which cannot be accomplished unless there is some public dissemination of information relating to the plaintiff.[23] Plaintiff, however, alleges none with respect to her involvement, if any, in the Iran–Contra matter or Hutton's misunderstanding of her 1988 letters. Therefore she has failed to state a claim in this respect. As a general matter, the legally protected interest embodied in a false light claim is the right to privacy. The essence of such a claim is an effect upon some audience of the attribution to a plaintiff of certain statements, views, or conduct, that she does not hold or did not perform, and that would be objectionable to a reasonable person under the circumstances. *See generally Prosser and Keeton on Torts* § 117. Plaintiff has made no allegation that any employee of the Hutton entities asserted publicly that she was involved in the Iran–Contra matter. Plaintiff has alleged no facts, other than her mere employment at Hutton Trust, which would support an inference that members of the public were led to believe she was involved in the Iran–Contra matter. Thus, this allegation fails to state a claim.

### D. The Additional Defamation Claim

Plaintiff alleges that the Delaware Bank Commissioner, at the behest of Hutton's counsel, asserted at an April 18, 1986 press conference that she had challenged the legitimacy of the Trust's activities because she was "disgruntled." (Motion to Amend ¶ 52). This claim fails on its face. First, it is time-barred as it does not relate back to

---

23. The Restatement (Second) of Torts, § 652E defines such a claim as follows: "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if:
 (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the *publicized* matter and the false light in which the matter would be placed." (emphasis added)

matters in the original complaint (and would be time-barred even if it did). In all events, the statement allegedly made by the Bank Commissioner would not, in my opinion, rise to the level of a defamatory remark as defined by the Second Restatement. *See* p. 9, *supra.*[24]

### E. The Claim for Aiding and Abetting By Shearson

 Plaintiff attempts to allege that Shearson knew of and participated in some of the "illegal activities" conducted at the Hutton entities. It therefore allegedly knew that these activities had driven the Hutton Group stock price down, and took advantage of this by purchasing Hutton Group at an unfairly cheap price. Thus, plaintiff contends that Shearson "aided and abetted" Hutton's managers' fiduciary breaches.

These allegations fail to state a claim upon which relief could be granted. While the breaches of duty that Shearson is alleged to have "aided and abetted" occurred in the years before the merger, the allegedly wrongful conduct on Shearson's part derive from its conduct during the negotiation and effectuation of the Hutton merger.

There is no fact alleged that would support a conclusion that Shearson had or breached a fiduciary duty to Hutton's shareholders in connection with negotiating the Agreement of Merger. Shearson, for all that is alleged, had a right to negotiate as advantageous a deal as it could in these circumstances. The Hutton shareholder's interests were to be protected by its board and all stockholder claims against that board have been settled and released. Thus so long as the second step merger was effectuated on the terms negotiated by that board and no fundamental change in the economics of the firm intervened, there can in my opinion be no liability of the acquiror arising out of the effectuation

of the second leg of a single two step tender offer cash out/merger transaction. *See Cinerama, Inc. v. Technicolor Inc.*, Del.Ch., C.A. No. 8358, 1991 WL 111134, Allen, C. (June 27, 1991) *rev'd on other grounds*, Del.Supr., 634 A.2d 345 (1993). This claim, therefore, cannot be brought in this proceeding.[25]

### F. The Claim That Plaintiff's Termination was Procedurally Flawed

 Plaintiffs seeks to add the claim that her termination was wrongful or ineffective because the board of directors Hutton Trust, pursuant to the company's bylaws, could only terminate plaintiff through a *supermajority* vote, is precluded from further litigation. The United States District Court, after trial, concluded that the supermajority voting provision did, in fact, require a three fifths vote for termination of certain corporate officers, including Shearin. It found that the board, which consisted of ten members at that time, did satisfy this requirement. The majority vote (six of ten) which approved Shearin's termination was equivalent, in this instance, to the amount required by the supermajority voting provision. Since plaintiff has had a full and fair opportunity to litigate this issue, she is bound by that adjudication.

\* \* \*

For the foregoing reasons the motion to amend the complaint will be denied. The motion to dismiss the complaint will be denied, providing however that the foregoing adjudications will govern further litigation of this matter in this court.

Defendants shall submit an order on notice.

---

24. Relatedly, plaintiff's attempt to assert now a claim in the nature of fraudulent inducement to her employment is plainly time-barred in 1994. It does relate to matters concerning her decision to accept employment with Hutton Trust. That subject is not dealt with in the original complaint and the amendment thus does not relate back under Rule 15(c). Moreover, plaintiff has known since the date of filing the original complaint all

facts necessary to try to justify this claim, but has not asserted this over the intervening years.

25. An alternative theory would be that Shearson is liable as an aider and abettor with respect to the activities underlying the waste claim. Such a claim would be derivative and plaintiff therefore lacks standing to assert it.