# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| PREMIUM CHOICE INSURANCE SERVICES, | ) ) ) ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. N24C-01-006 PRW CCLD |
| INNOVATIVE FINANCIAL GROUP HOLDINGS, LLC, and HUMANA, INC., | ) ) ) ) | |
| Defendants. | ) | |

Submitted:  July 3, 2024
Decided: July 9, 2024

## <u>MEMORANDUM OPINION AND ORDER</u>

*Upon Defendants Innovative Financial Group Holdings, LLC,
and Humana Inc.'s Motion to Dismiss,*
**GRANTED, in part, DENIED, in part.**

Geoffrey G. Grivner, Esquire, Kody M. Sparks, Esquire, BUCHANAN INGERSOLL & ROONEY PC, Wilmington, Delaware; Benjamin N. Gluck, Esquire, Oliver Rocos, Esquire (*argued*), Barr Benyamin, Esquire, BIRD MARELLA LLP, Los Angeles, California, *Attorneys for Plaintiff Premium Choice Insurance Services.*

Alexandra M. Cummings, Esquire, Sara Carnahan, Esquire, MORRIS, NICHOLS, ARSHT & TUNNEL LLP, Wilmington, Delaware; Scott C. Solberg, Esquire, Gregory M. Schweizer, Esquire (*argued*), Caroline P. Malone, Esquire, EIMER STAHL LLP, Chicago, Illinois, *Attorneys for Defendants Innovative Financial Group Holdings, LLC, and Humana Inc.*

**WALLACE, J.**

This dispute arises from the unilateral and allegedly untimely termination of the parties' contractual relationship. The central issue is, essentially, the extent to which Defendant Innovative Financial Group Holdings, LLC ("IFG") had the opportunity for a do-over after submitting a plainly deficient termination notice. Regardless of the answer to that question, though, Plaintiff Premium Choice Insurance Services ("Premium") has viable alternative claims to hold IFG liable. But no matter IFG's potential liability, Premium's claim against IFG's indirect parent, Defendant Humana, Inc., is untenable.

IFG and Premium had a contractual agreement comprised of an interconnected statement of work (the "SOW") and master services agreement (the "MSA" and together with the SOW, the "Agreement"). Pursuant to the Agreement, Premium could sell Medicare Advantage policies that large insurers offered through IFG—in other words, Premium and IFG are different levels of Medicare middlemen with IFG working more closely with insurers and Premium more closely with consumers. Under the Agreement, IFG retained three powers to end the relationship that are relevant here: (1) IFG could immediately revoke Premium's authority to perform services on IFG's behalf if IFG determined Premium's performance was not "satisfactory"; (2) IFG could terminate the Agreement if Premium didn't remedy an identified breach within 30 days of receiving notice of the breach; and (3) IFG could terminate the Agreement for convenience 90 days after providing notice to

Premium.

On November 20, 2023, IFG exercised a fourth option. In an email with the subject line "Termination of Agreement," IFG informed Premium that it had "chosen to move in a new direction and will terminate [its] relationship with Premium Choice, all agents and downlines effective immediately." The next day, after Premium pointed out the Agreement's termination provisions, IFG sent a new notice claiming Premium's performance was unsatisfactory and that Premium had 30 days to prove that it was fully complying with a nonspecific set of regulatory and contractual requirements. In that second notice, IFG confirmed it was immediately revoking Premium's authority and would terminate the Agreement if Premium did not demonstrate its compliance within 30 days. Premium sued.

Premium brings alternative claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The traditional breach-of-contract claim is premised on the fact that the November 20th email terminated the Agreement in violation of the Agreement's terms. The implied covenant claim is premised on the fact that the November 21st notice was sent in bad faith as a post-hoc rationalization for the earlier attempt at termination. In the end, those claims won't be able to stand together because if the November 20th email effectively terminated the Agreement, then the November 21st notice had no actual effect.

Though the parties don't say as much, this case is about the effect of a

repudiation. On November 20, IFG repudiated the Agreement by unequivocally demonstrating its intent to cease performance. The effect of that act depends on Premium's response. Premium could have elected to accept the repudiation, thus terminating the Agreement, and allowing Premium to sue for total breach; or Premium could have elected to reject the repudiation and keep the Agreement alive. Whether Premium can now pursue its breach-of-contract claim or its breach of the implied covenant claim turns on which option Premium elected. But that factual issue can't be resolved at this stage, so the two causes of action survive for now to proceed as alternatives.

As a separate matter, Premium blames Humana for causing IFG to terminate the Agreement after Humana acquired IFG, which is the sole pled basis for its tortious interference claim. But Premium itself acknowledges that IFG breached for "business reasons," and Premium doesn't even hint at an illegitimate motive by Humana. It is clear, therefore, that the affiliate privilege applies, and Humana cannot be liable for tortious interference.

Accordingly, the Court **GRANTS** the Motion as to Count III (tortious interference) but **DENIES** the Motion as to Counts I and II (breach of contract and breach of the implied covenant).

## I. BACKGROUND

### A. THE PARTIES

Premium is a California corporation with its principal place of business in California.[1] IFG is a North Carolina limited liability company with its principal place of business in North Carolina.[2] And Humana is a Delaware corporation with its principal place of business in Kentucky.[3]

### B. THE AGREEMENT

Premium is an insurance broker that specializes in Medicare Advantage policies.[4] Due to its comparatively small size, Premium "works with middleman companies that are agents of national insurance companies,"—like IFG.[5]

IFG is a licensed agent of insurance companies that offer Medicare Advantage policies.[6] In 2021, IFG and Premium entered a contract through which Premium would market and sell Medicare Advantage policies offered by IFG's principals.[7] Premium was paid per policy sold, which amounted to approximately $1 million of

---

[1]  D.I. No. 1 ("Compl.") ¶ 11.

[2]  *Id.* ¶ 12.

[3]  *Id.* ¶ 13.

[4]  *Id.* ¶ 20.

[5]  *Id.* ¶¶ 20-21.

[6]  *Id.* ¶ 21.

[7]  *Id.* ¶ 22.

income per month.[8]

In August 2022, Humana—one of IFG's principals—acquired IFG.[9]  In October 2023, IFG and Premium re-upped their relationship through the Agreement.[10]  The Agreement had an initial one-year term.[11]  The Agreement required Premium to abide by all applicable laws, including specific Medicare-related regulations.[12]

Three of the Agreement's provisions are particularly relevant here.  First, MSA Section 14(b) governs termination of the Agreement.  MSA Section 14(b)(i) provides in pertinent part:  "[IFG] may terminate this Agreement and/or any SOW for convenience at any time upon ninety (90) days prior, written notice to [Premium] provided however that no termination for convenience shall become effective within a Blackout Period defined as extending from August 1st through January 1st in any calendar year."  The MSA explains the effect of a termination for convenience during a Blackout Period, but those details are of no moment here.

Next, MSA Section 14(b)(ii) provides in pertinent part: "Either Party will

---

[8]  *Id.* ¶ 23.

[9]  *Id.* ¶ 24.

[10]  *Id.* ¶ 25; *see also* D.I. No. 11 ("Mot."), Ex. A.  Exhibit A contains the MSA, the SOW, and the SOW's four appendices.  Hereinafter, citations and references to the Agreement documents in Exhibit A will use only each individual document's title—*i.e.*, MSA, SOW, App'x 1, App'x 2, App'x 3, and App'x 4.

[11]  MSA § 14(a).

[12]  *Id.* § 3(b); App'x 2 § 1(b); App'x 3 §§ 2(a), 3(q).

have the right to terminate this Agreement and/or any SOW . . . upon the failure by the other Party to remedy a breach of this Agreement within thirty (30) days' after receiving written notice of such breach from the such Party [sic]."

Last, Appendix 2 to the SOW is titled the "Medicare Regulatory Addendum" (the "MRA"). MRA Section 1(e) provides in pertinent part:

> In instances where . . . [IFG] determine[s] that [Premium] has not performed satisfactorily, or has failed to meet all reporting and disclosure requirements in a timely manner, [IFG] has the right to revoke and assume the delegated activities or reporting and disclosure requirements upon written notice to [Premium], or upon the failure by [Premium] to remedy a breach of this Agreement within thirty (30) days' after receiving written notice of such breach [IFG] may terminate the Agreement.

The MRA's introduction defines the "Agreement" as the MSA and "all Statements of Work entered into thereunder."

## C. THE TERMINATION NOTICES

On November 20, 2023—less than two months into the year-long Agreement—Nick Tatge, an IFG representative, sent the following email to a Premium representative, with the subject line "Termination of Agreement":

> I'm writing to inform you that Innovative Financial Group has chosen to move in a new direction and will terminate our relationship with Premium Choice, all agents and downlines effective immediately.
>
> We will remove all Premium Choice agents and downlines from our systems, support programs, and platforms effective immediately.
>
> You will be required to respond to all carrier inquiries and compliance requests made through Innovative Financial Group's Sales Integrity

-6-

team to remain in good standing for all previous agreements that remain in place. Failure to do so will terminate the relationship in full.

Within the next 24 hours we will notify all carriers of your release for all products and lines of business so that you can transition with each carrier however you see best for you and your organization.

We wish you the best in your future endeavors.[13]

Upon receipt of that email, Premium "responded to Mr. Tatge by telephone and email, disputing the purported termination and referring him to the 90-day notice period required in Section 14(b)(i) of the [MSA] for a termination of convenience."[14] IFG didn't respond to Premium on November 20; but, as promised in the email, Premium's ability to provide services under the Agreement was cut off that evening.[15]

"Notwithstanding the termination, Premium Choice continued to protest IFG's actions."[16] So, at the end of the day on November 21, 2023, Mr. Tatge emailed Premium a more formal termination notice.[17] The letter had the subject line: "Revocation of Delegation Under the Medicare Regulatory Addendum and Termination of the Master Service Agreement and Statement of Work (collectively, the 'Agreement') between Innovative Financial Group ('IFG') and Premium Choice

---

[13]   Mot., Ex. C ("Nov. 20th Email").

[14]   Compl. ¶ 31.

[15]   *Id.* ¶ 32.

[16]   *Id.* ¶ 33.

[17]   *Id.* ¶ 33; Mot., Ex. B ("Nov. 21st Notice").

Insurance Services ('Premium Choice')."[18] The body of the November 21st notice reads:

> IFG is notifying you that pursuant to Section 1(e) of the Medicare Regulatory Addendum to the Master Services Agreement and related Statement of Work, IFG is immediately revoking delegation to Premium Choice of all Services under the Statement of Work due to IFG's determination that Premium Choice has not performed the Services satisfactorily. Specifically, Premium Choice has been the subject of a large number of Medicare beneficiary complaints made to the Centers for Medicare & Medicaid Services or the Medicare Advantage Organization Clients of IFG alleging a wide range of agent misconduct inconsistent with CMS requirements and the requirements of the Medicare Regulatory Addendum and Medicare Marketing Addendum to the Agreement.
>
> Accordingly, IFG is revoking delegation of all Services under the Agreement effective immediately. This means that neither Premium Choice nor its Selling Agents may market, solicit, negotiate, or sell any of the Medicare Advantage Products under the Agreement unless and until delegation to Premium Choice is reinstated. IFG is also notifying you that it is exercising its right pursuant to Section 14(b)(ii) of the Master Services Agreement to terminate both the Master Services Agreement and Statement of Work effective December 22, 2023 unless Premium Choice is able to demonstrate to IFG's satisfaction that it is in full compliance with applicable Medicare requirements and the requirements of the Medicare Regulatory Addendum and Medicare Marketing Addendum.[19]

According to Premium, IFG never explained what specific complaints or misconduct precipitated the purported revocation of authority and for-cause

---

[18] Nov. 21st Notice.

[19] *Id.*

termination.[20]  Premium also alleges that IFG had never previously raised concerns about any complaints.[21]  Too, Premium says that "[a]ll insurance brokers in Premium Choice's position receive complaints and there are established industry standards for addressing such complaints."[22]  Premium continues that the number of complaints it received was "far below the industry standard thresholds."[23]  Thus, Premium posits that the November 21st notice was a pretext for the improper termination for convenience announced the day before.[24]

Premium says that IFG terminated the Agreement "because it was changing its business practices."[25]  Reinforcing that conclusion, according to Premium, is the fact that IFG contemporaneously terminated its agreements with other brokers in Premium's position.[26]  Premium believes that Humana ordered IFG's transformation.[27]  To support that inference, Premium notes that (1) Premium and IFG had a continuous relationship for years before Humana took over IFG; (2) Humana "made substantial changes to IFG's management structure in the

---

[20]  Compl. ¶ 35.

[21]  *Id.* ¶ 37.

[22]  *Id.* ¶ 36.

[23]  *Id.* ¶ 37.

[24]  *Id.* ¶ 38.

[25]  *Id.*

[26]  *Id.* ¶ 39.

[27]  *Id.* ¶ 41.

months before the termination of the Agreement"; and (3) Mr. Tatge copied Humana's Associate General Counsel on the fateful communications with Premium.[28]

## II. APPLICABLE LEGAL STANDARDS

Now before the Court is the Defendants' motion to dismiss all of Premium's claims against them. "Under Superior Court Civil Rule 12(b)(6), the legal issue to be decided is, whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint."[29] And under that Rule, the Court will:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[30]

If any "reasonable conception" can be formulated to allow a plaintiff's recovery, the motion must be denied.[31] This is because "[d]ismissal is warranted [only] where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for

---

[28] *Id.* ¶¶ 42–44.

[29] *Vinton v. Grayson*, 189 A.3d 695, 700 (Del. Super. Ct. 2018) (cleaned up).

[30] *Id.* (alteration in original) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011)).

[31] *Id.* (citing *Cent. Mortg. Co.*, 27 A.3d at 535).

which relief might be granted."[32]

## III.  PARTIES' CONTENTIONS

### A. IFG AND HUMANA URGE DISMISSAL OF ALL THREE COUNTS.

To resist Premium's claims against IFG, Defendants first argue that the November 21st notice was proper in light of the Agreement's revocation and for-cause termination provisions.[33]  In Defendants' view, Premium's admission that it had been the subject of complaints demonstrates that IFG was entitled to immediately revoke Premium's authority and require Premium to cure within thirty days.[34]  And say Defendants, since Premium did not "demonstrat[e] compliance with Medicare requirements" within thirty days, IFG was within its rights to terminate the Agreement.[35]

Of course, Defendants must also contend with the undisputed text of the November 20th email.  To do so, they suggest that the email titled "Termination of Agreement"—referencing IFG's desire "to move in a new direction"—was really an implied notification that IFG was revoking Premium's authority pursuant to MRA Section 1(e) because of Premium's unsatisfactory performance.[36]  Defendants then

---

[32]  *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Ct. Aug. 20, 2004) (citation omitted).

[33]  Mot. at 17-20.

[34]  *Id.* at 19-20.

[35]  *Id.* at 20.

[36]  *Id.* at 20-21.

contend that if the "Termination of Agreement" email is somehow construed as an attempt to terminate the Agreement, "it is without effect."[37] In other words, Defendants posit that because IFG did not comply with the Agreement's termination provisions, the Agreement remained in force and thus wasn't breached.[38] Defendants' final defense of the November 20th email is that even if it can be considered a breach, it was timely cured by the November 21st notice.[39]

With respect to the implied covenant claim, Defendants initially insisted that it was duplicative of the breach-of-contract claim.[40] In their reply, Defendants pivoted to arguing that Premium's admission to receiving complaints proves that IFG validly exercised its discretion under MRA Section 1(e).[41] Relatedly, Defendants assert that Premium foreclosed any contractual remedies by failing to timely cure its own breach, even though Premium maintains it never breached.[42]

Turning to the tortious interference claim against Humana, Defendants rely upon the affiliate privilege. Their opening brief contains a choice-of-law analysis that they later largely abandon.[43] The substance of Defendants' argument is that, by

---

[37] *Id.* at 21-22.

[38] *Id.*

[39] *Id.* at 22-23.

[40] *Id.* at 24.

[41] Reply at 19-20.

[42] *Id.* at 17-18.

[43] Mot. at 9-15; Reply at 3. Defendants initially analyzed whether North Carolina, Kentucky, California, or Delaware law should apply to the tortious interference claim. Mot. at 9-15. In their

Premium's own account, IFG terminated the Agreement for business reasons, not any improper motive.[44]  Because an improper motive is required to overcome the affiliate privilege, Defendants say the tortious interference claim must fail.[45]

## B. PREMIUM RESISTS DISMISSAL.

Premium counters that the November 20th email was plainly an improper termination for convenience—and that, Premium says, amounted to a breach.[46] Premium adds that it is "contrary to common sense" to conclude that an improper termination does not breach a contract precisely because it was improper.[47]  Next, Premium urges  that once the Agreement was terminated on November 20, the November 21st notice could not effect a termination on different grounds.[48]

In the alternative, Premium says that if the November 21st notice succeeded in replacing the November 20th email, it was a bad-faith exercise of IFG's discretion under MRA Section 1(e).[49]  Premium relies on the seemingly pretextual nature of the November 21st notice—including the lack of substantive details regarding the

---

reply, Defendants conclude, "[t]hough there are subtle differences among the states' laws that, depending on the facts of a given case, could result in different outcomes, Humana agrees that no matter which state's law applies here, Plaintiff has failed to state a claim against Humana for tortious interference."  Reply at 3.  Defendants' reply then analyzes Delaware law. *Id.* at 3-7.

[44]  Mot. at 13-15.

[45]  *Id.*

[46]  Opp'n at 8-12.

[47]  *Id.* at 12-15.

[48]  *Id.* at 16-17.

[49]  *Id.* at 17-21.

alleged non-compliance—to argue that the November 21st notice was a termination for convenience in for-cause clothing.[50] Premium notes that because its implied covenant claim is an alternative argument it is not duplicative of the breach-of-contract claim.[51]

As for the tortious interference claim, Premium contends Delaware law should apply but says its claim survives under any state's standard.[52] Premium contests the affiliate privilege's applicability here by explaining the early termination of the Agreement combined with the supposed lie in the November 21st notice demonstrates bad faith.[53] But Premium candidly admits that it does not know—and, more importantly, has not alleged—what Humana's motivation was and instead blithely proclaims it "has earned the opportunity to find out and should be given the opportunity to proceed with this claim."[54]

## IV.  DISCUSSION

### A. PREMIUM HAS REASONABLY CONCEIVABLE ALTERNATIVE BREACH-OF-CONTRACT AND IMPLIED COVENANT CLAIMS.

The parties' disagreement about whether the November 20th or 21st notice is the controlling document—as well as, presumably, their resort to far-flung

---

[50]   *Id.*

[51]   *Id.* at 22.

[52]   *Id.* at 30-31.

[53]   *Id* at 31-33.

[54]   *Id* at 33.

-14-

precedent—is rooted in the fact that neither party squarely addresses the most applicable legal principle. More specifically, they largely ignore the issue of repudiation, which controls here.

"A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions."[55] That refusal can be communicated through words or actions, but it must be "positive and unconditional."[56] It seems, at this point, that's just what IFG's November 20th email communicating that it was immediately terminating its relationship with Premium, along with the same-day removal of Premium's ability to access IFG's systems, was. That leaves the question of what effect IFG's repudiation had.

The parties cannot agree on whether the November 20th repudiation terminated the Agreement because there is not one right answer at this stage. Instead, "[a] party confronted with a repudiation may respond by (i) electing to treat the contract as terminated by breach, (ii) by lobbying the repudiating party to perform, or (iii) by ignoring the repudiation."[57] Thus, "whether repudiation amounts

---

[55] *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *16 (Del. Ch. Mar. 1, 2022) (quoting *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014 (Del. Ch. 2004)); *see also Moscowitz v. Theory Ent. LLC*, 2020 WL 6304899, at *26 (Del. Ch. Oct. 28, 2020) ("A party repudiates a contract when it takes an action that constitutes a significant and substantial alteration of both the present and reasonably anticipated future relations created by the agreement." (quoting *PAMI-LEMB*, 857 A.2d at 1014)).

[56] *CorePower Yoga*, 2022 WL 601862, at *16 (quoting *W. Willow-Bay Ct.*, *LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009)).

[57] *W. Willow-Bay*, 2009 WL 458779, at *5 (citation omitted).

to a present breach is predicated on the promisee's response."[58]

If the non-repudiator elects to treat the contract as terminated by breach, then that result is final and the non-repudiator can immediately pursue damages.[59] If, however, the non-repudiator neither acts in reliance on the contract's termination nor communicates to the repudiator that it considers the contract terminated, the repudiator can retract the repudiation.[60] Retracting a repudiation "has the effect of nullifying [the] repudiation and placing the matter in its original position."[61]

In light of those rules, whether the November 20th email breached and terminated the Agreement such that the November 21st notice was meaningless turns on whether IFG effectively retracted its repudiation. That issue, in turn, depends on whether Premium accepted the repudiation. The Complaint is not entirely clear on the issue,[62] so there's a reasonable inference in either direction. If Premium elected

---

[58] *Id.* (citation omitted).

[59] *Moscowitz*, 2020 WL 6304899, at *26-27 (quoting *Henkel Corp. v. Innovative Brands Hldgs., LLC*, 2013 WL 396245, at *7 (Del. Ch. Jan. 31, 2013)).

[60] *Id.* (citations omitted).

[61] *Id.* at *26 (quoting *Carteret Bancorp, Inc. v. Home Grp., Inc.*, 1988 WL 3010, at *6 (Del. Ch. Jan. 13, 1988)).

[62] The Complaint states that Premium "disput[ed] the purported termination" and "protest[ed] IFG's actions." Compl. ¶¶ 31, 33. That seems to suggest Premium rejected the repudiation, which would mean the Agreement was still in force when IFG sent the November 21st notice. But, giving Premium the benefit of the doubt, it is reasonably conceivable that Premium's protests and disputes related to whether the termination was permitted under the Agreement, not whether the termination was effective. In fact, the Complaint also says that once IFG removed Premium from its systems on November 20, Premium "could not provide any services under the Agreement and *it was effectively terminated*." *Id.* ¶ 32 (emphasis added). Greater factual development is warranted

-16-

to treat the Agreement as terminated by breach, then it follows that Premium now has an amply conceivable claim for breach of contract.[63]

On the other hand, if Premium didn't consider the Agreement to be terminated before IFG sent the November 21st notice, then IFG could have retracted its repudiation by purporting to adhere to the Agreement through its November 21st notice. But that still wouldn't necessarily extricate IFG here.

"[W]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."[64] If a party with the discretionary power to terminate a contract does so for a "pretextual"—as opposed to good faith—reason, that can establish a breach of the implied covenant.[65]

While Defendants have no problem doing so, the Court can't say on these pleadings that the November 21st notice does not smell strongly of pretext. IFG sent it the day after IFG purported to immediately terminate the Agreement for an entirely different, and entirely unallowed (for immediate termination), reason—*i.e.*, that IFG

---

before deciding which option Premium elected in the hours between the November 20th email and November 21st notice.

[63]  Defendants' suggestion that the November 20th email was a contractually permitted revocation of authority under MRA Section 1(e) is belied by even a cursory glance at the email's subject line. That's not to mention that any ambiguity as to the meaning of that email's text must be resolved in Premium's favor at this stage.

[64]  *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 n. 97 (Del. 2022) (quoting *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146-47 & n.1 (Del. Ch. 2009)).

[65]  *See Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, 2015 WL 3863245, at *7-8 (Del. Super. Ct. June 10, 2015).

simply "chose[] to move in a new direction."[66] Plus, the November 21st notice only vaguely raised concerns that Premium alleges were baseless—concerns that had apparently never arisen at any other point during IFG and Premium's years-long relationship. It's a fair inference that the sudden emergence of IFG's dissatisfaction with nondescript customer complaints was no coincidence. That IFG cut ties with other smaller brokers around the same time only adds to the inference that IFG's actions were driven by its own machinations and not Premium's performance.

Defendants' suggestion that Premium failed to cure its own alleged breach is unavailing at this stage. In support, Defendants claim that Premium "receiv[ing any] Medicare complaints . . . is a breach of the Agreement."[67] But that doesn't seem an accurate read at this point.

The three provisions Defendants cite for their postulation each state that Premium must abide by applicable laws—they say nothing about merely receiving customer complaints.[68] Premium contends that the complaints lodged against it were standard in the industry and that the industry has a specific method for evaluating them.[69] There are no allegations—including in the November 21st notice—that Premium actually violated any laws. Accordingly, it is reasonably conceivable that

---

[66] Nov. 20th Email.

[67] Reply at 18.

[68] *See* App'x 2 § 1(d); MSA §§ 3(b), 8(c).

[69] Compl. ¶ 36.

-18-

there was never any breach for Premium to cure.

For those reasons, Premium has viable alternative claims against IFG for breach of the Agreement or breach of the implied covenant of good faith and fair dealing. Factual questions preclude dismissing either at this stage.

## B. PREMIUM'S TORTIOUS INTERFERENCE CLAIM IS DEFICIENT.

While Premium has viable contractual claims against IFG, it does not have a viable tort claim against IFG's parent, Humana. Since Defendants accept application of Delaware law (so long as it leads to dismissal),[70] there is no need to address the choice-of-law analysis.[71]

A tortious interference with contract claim must satisfy five elements: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[72] Delaware law has "narrowly circumscribe[d]" this tort to leave legitimate competition unchilled.[73] For similar reasons, Delaware has

---

[70] Reply at 3 & n.1.

[71] In any event, it seems unlikely that the "subtle differences among the states' laws" that Defendants identified begets an "actual conflict." *See, e.g.*, *Crawford v. Syngenta Crop Prot., LLC*, 2024 WL 2831554, at *3 (Del. Super. Ct. May 31, 2024) ("No actual conflict exists if applying the different laws yields the same result." (citation omitted)).

[72] *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *6 (Del. Super. Jan. 13, 2021) (quoting *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013)).

[73] *Id.* (quoting *Sherin*, 652 A.2d at 589).

adopted an affiliate privilege for contractual interference.[74]

Delaware courts are resolute in their respect for the separate existence of legal entities.[75] Our law has therefore recognized the extreme difficulty of tagging a parent entity with a claim for its subsidiary's breach of contract.[76] Were it otherwise, "every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach-of-contract cases."[77] Thus, a parent entity's alleged interference is presumptively justified by legitimate profit-seeking activities, and plaintiffs are rightfully tasked to allege specific facts to rebut that presumption.[78] Specifically, the plaintiff "must adequately plead that the defendant 'was motivated by some malicious or other bad faith purpose.'"[79]

Premium doesn't come close to meeting that standard. Indeed, it pleads the opposite. Premium alleges, "IFG . . . terminated the Agreement because it was

---

[74] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 142-43 (Del. Ch. 2023) (discussing the conceptual underpinnings of the affiliate privilege).

[75] *See, e.g.*, *Barbey v. Cerego, Inc.*, 2023 WL 6366055, at *9 (Del. Ch. Sept. 29, 2023) (""[O]ur corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected . . . ." (alteration in original) (quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006))).

[76] *Surf's Up*, 2021 WL 117036, at *7.

[77] *Renco Grp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *9 (Del. Ch. Jan. 29, 2015) (quoting *Allied Cap.*, 910 A.2d at 1039)).

[78] *Surf's Up*, 2021 WL 117036, at *7 (citations omitted); *Shearin v. E.F. Hutton Grp.*, Inc. 652 A.2d 578, 591 (Del. Ch. 1994).

[79] *James Cable, LLC v. Millennium Digit. Media Sys., L.L.C.*, 2009 WL 1638634, at *4 (Del. Ch. June 11, 2009) (quoting *Shearin*, 652 A.2d at 591).

changing its business practices."[80] Premium continues, "IFG terminated the Agreement for business reasons."[81] Even more to the point, the Complaint suggests that Humana's motivation for allegedly inducing IFG's breach was Humana's desire to "change [IFG's] business practices."[82] Premium's opposition brief backtracks from that suggestion and claims "it cannot yet tell precisely why Defendants did what they did";[83] but that assertion brings Premium no closer to "alleg[ing] *facts*" to rebut the presumption that Humana acted with legitimate economic interests in mind.[84] And on the mere musings it has put forth, Premium's request for a rummaging into Humana's possible motivations isn't appropriate here.[85] Premium's tortious interference claim against Humana must be dismissed.

## IV. CONCLUSION

Premium has not adequately pled facts permitting the inference of malice or

---

[80] Compl. ¶ 38.

[81] *Id.* ¶ 39.

[82] *Id.* ¶¶ 42-43.

[83] Opp'n at 33.

[84] *Renco Grp.*, 2015 WL 394011, at *9 (emphasis in original). To be clear, a parent entity inducing an intentional breach does not equate to bad faith if the breach was considered economically efficient for the subsidiary. *See PPL Corp. v. Riverstone Hldgs. LLC*, 2019 WL 5423306, at *13 (Del. Ch. Oct. 23, 2019) (citations omitted).

[85] *Renco Grp.*, 2015 WL 394011, at *9 (where a complaint's "allegations do not offer facts permitting the inference of malice or bad faith in the context of the parties' sophisticated business arrangement (as opposed to supporting a breach of contract by [a] wholly-owned [entity]) . . . . it is not reasonably conceivable" that a plaintiff can overcome the affiliate privilege based on such pleadings and so dismissal of a claim for tortious interference with contractual relations on a defendant's motion is due).

bad faith necessary for its claim against Humana, so the Court cannot find that it is reasonably conceivable that it can overcome the affiliate privilege. In turn, Defendants' motion to dismiss Count III of Premium's complaint is **GRANTED.** On the other hand, as explained above, Premium has—in light of the facts, circumstances, and reasonable inferences deduced—adequately pled its alternative breach-of-contract and implied covenant of good faith and fair dealing claims. So, the prayers to dismiss Counts I and II of the complaint are **DENIED.**

IT IS SO ORDERED.

/s/ Paul R. Wallace

_____

Paul R. Wallace, Judge