**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

JAMES E. CONLON, and )
ELITE CORPORATION, )
           )
         Plaintiffs, )
           )
         v. )     C.A. No. N23C-11-151 EMD CCLD
           )
CGI MANUFACTURING BUYER, LLC, )
CGI MANUFACTURING HOLDINGS, LLC, )
CORE INDUSTRIAL PARTNERS, LLC, )
and ELITE MANUFACTURING )
TECHNOLOGIES LLC, )
           )
         Defendants. )

Submitted: May 6, 2024
Decided: August 8, 2024

*Upon Defendants' Motion to Dismiss Count II of the Complaint*
**GRANTED**

David S. Eagle, Esquire, Klehr Harrison Harvey Branzburg LLP, Bonita L. Stone, Esquire, Janet R. Widmaier, Esquire, Katten Muchin Rosenman, Chicago, Illinois. *Counsel for Plaintiffs James E. Conlon and Elite Corporation.*

A. Thompson Baylis, Esquire, April M. Ferraro, Esquire, S. Michael Blochberger, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware, John Schreiber, Esquire, Daniel M. Aronsohn, Esquire, Winston & Strawn LLP, Los Angeles, California. *Counsel for Defendants CGI Manufacturing Buyer, LLC, CGI Manufacturing Holdings, LLC, and Core Industrial Partners, LLC.*

**DAVIS, J.**

## I.       INTRODUCTION

This is a breach of contract and tortious interference with contract action assigned to the Complex Commercial Litigation Division of the Court. Plaintiffs James E. Conlon and Elite Corporation ("Elite Corp." or "Seller" and, together with Mr. Conlon, "Plaintiffs") allege that Defendants CGI Manufacturing Buyer LLC ("Buyer"), CGI Manufacturing Holdings LLC

("Holdings" or "Holdings/Cadrex"), CORE Industrial Partners, LLC ("CORE" and, together with Buyer and Holdings/Cadrex, "Defendants"), either breached or caused the other Defendants to breach the earnout provisions of the Parties' 2022 Equity Purchase Agreement ("EPA") governing the sale of non-party Elite Manufacturing Technologies LLC, now d/b/a Cadrex-Bloomingdale ("Elite").[1]

Plaintiffs filed their Complaint on November 16, 2023.[2] Defendants filed a Motion to Dismiss the Complaint or, in the Alternative, to Stay (the "Motion to Dismiss or Stay") on January 12, 2024.[3] Plaintiffs opposed the Motion.[4] Defendants filed a Motion to Stay Discovery on March 6, 2024 (the "Motion to Stay Discovery").[5] Plaintiffs opposed this motion and filed a Cross-Motion to Stay the Parties' Earnout Calculation Process (the "Cross-Motion") on April 5, 2024.[6] Defendants opposed the Cross-Motion.[7]

The Court held a hearing on the motions on May 6, 2024.[8] At the conclusion of the hearing, the Court denied Defendants' Motion to Dismiss or Stay Count I; denied Defendants' Motion to Stay Discovery; and denied Plaintiffs' Cross-Motion to Stay the Parties' Earnout Calculation Process. The Court took Defendants' Motion to Dismiss Count II under advisement and granted Defendants' Motion to Stay Count II pending this decision.

For the reasons stated below, the Motion to Dismiss Count II is **GRANTED.**

---

[1] Plaintiffs voluntarily dismissed Elite as a Defendant shortly after filing their Complaint (see D.I. No. 2). However, the Parties did not move to amend the caption.
[2] Hereinafter "Compl." (D.I. No. 1).
[3] Hereinafter "MTD" (D.I. No. 3).
[4] Plaintiffs' Opposition to Defendants' Motion to Dismiss the Complaint or, in the Alternative, to Stay (hereinafter "Opp'n MTD") (D.I. No. 12).
[5] D.I. No. 15.
[6] D.I. No. 24.
[7] D.I. No. 29.
[8] D.I. No. 34.

## II.     RELEVANT FACTS

### A. THE PARTIES AND RELEVANT NON-PARTY

#### 1.  *Plaintiffs*

Mr. Conlon is a citizen and resident of Illinois.[9]  He is the owner of Elite Corp.[10]

Elite Corp. is an Illinois corporation.[11]  Prior to Defendants purchase of Elite, Elite Corp. was the owner of Elite.[12]

Non-party Elite is a supplier of precision sheet metal fabrication and assemblies that specializes in manufacturing cabinets, consoles, and electro-mechanical assemblies for the gaming industry, as well as other end markets.[13]  Elite is an Illinois limited liability company.[14]

#### 2.  *Defendants*

CORE is a Delaware limited liability company and is a manufacturing, industrial technology, and industrial services-focused private equity firm.[15]  CORE owns Defendants Buyer and Holdings/Cadrex.[16]  CORE is not a party to the EPA.

Buyer is a Delaware limited liability company.[17]  Buyer is a wholly owned subsidiary of Holdings/Cadrex.[18]  Buyer is a "provider of complex sheet metal and machined production parts, assemblies, and weldments for a variety of end markets . . . ."[19]

---

[9] Compl. ¶ 1.
[10] MTD at 4.
[11] Compl. ¶ 2.
[12] MTD at 4.  Plaintiffs erroneously refer to the "sale of Elite Corp." despite acknowledging that Elite and Elite Corp. are separate entities, and that Elite "is the post-purchase entity owned by CORE.  Elite is the operational company that was sold . . . ."  Opp'n MTD at 2, n.3.  This does not affect the substance of Plaintiffs' arguments.  For clarity, this decisions will alter instances where Plaintiffs state "Elite Corp." when context indicates the correct party is Elite.
[13] Compl. ¶ 9.
[14] Equity Purchase Agreement (hereinafter "EPA"), *Recitals* (D.I. No. 1, Ex. B).  Elite was converted from an Illinois corporation to an Illinois LLC via the EPA.
[15] MTD ¶ 5.
[16] Compl. ¶ 5.
[17] *Id.* ¶ 3.
[18] MTD at 4.
[19] *Id.*

Holdings/Cadrex is a Delaware limited liability company.[20]  It is a CORE portfolio company[21] and the parent of Buyer.[22]

## B. NATURE OF THE DISPUTE

### 1. Defendants Acquire Elite

Mr. Conlon founded Elite in 1990.[23]  Plaintiffs describe the business that developed over the next thirty-plus years as having "a broad (and loyal) customer base" that relied on Elite's "abilities to provide manufacturing and other related product solutions to its customers in an effective, efficient, and, importantly, in a timely fashion."[24]

In 2021, CORE and Holdings/Cadrex were looking to acquire portfolio manufacturing companies that specialized in metal fabrication and mechanical solutions.[25]  Cadrex now has twenty-two such facilities and is "The Largest Mechanical Solutions Provider in North America."[26]

CORE and Holdings/Cadrex began discussing the acquisition of Elite with Mr. Conlon in July 2021.[27]  Plaintiffs state that Mr. Conlon had discussed a sale to other private equity firms, but ultimately decided that Holdings/Cadrex was "an attractive fit because of their willingness

---

[20] Compl. ¶ 3.  Following the acquisition of multiple entities including Elite, CGI Manufacturing Solutions was renamed Cadrex Manufacturing Solutions in 2022, a "unified platform and new brand" intended to position "Cadrex as the premier North American partner for medium-to-high volume manufacturing solutions . . . ." *CGI Manufacturing Relaunches as Cadrex Manufacturing Solutions*, BUSINESS WIRE (Aug. 18, 2022), https://www.businesswire.com/news/home/20220818005602/en/CGI-Manufacturing-Relaunches-as-Cadrex-Manufacturing-Solutions.

[21] *See, e.g.*, *CORE Industrial Partners Portfolio Company Cadrex Acquires IDL Precision Machining*, CORE INDUSTRIAL (Sept. 21, 2022), https://coreipfund.com/news/core-industrial-partners-portfolio-company-cadrex-acquires-idl-precision-machining/.

[22] MTD at 4.

[23] Compl. ¶ 9.

[24] *Id.*

[25] *Id.* ¶ 8; *See also* Tim Heston, *Precision Sheet Metal Behemoth Cadrex Manufacturing Solutions' perspective on consolidation*, THE FABRICATOR (June 7, 2023), https://www.thefabricator.com/thefabricator/article/shopmanagement/2023-fab-40-precision-sheet-metal-behemoth-cadrex-manufacturing-solutions-perspective-on-consolidation ("In less than two years [Cadrex] acquired 11 companies" and its "locations are all transitioning toward doing business under a single brand.").

[26] www.cadrex.com (last accessed Apr. 17, 2024).

[27] Compl. ¶ 9.

and eagerness to allow Conlon to continue to manage Elite" and that "post-sale Elite would continue to run as it had under Conlon's leadership, with only subtle and accretive changes . . . which would be done collaboratively with Conlon, to enhance Elite's productivity, revenue and value."[28]

### 2. *The Equity Purchase Agreement (EPA)*

On May 20, 2022, Plaintiffs entered into the EPA with Buyer and Holdings/Cadrex.[29] The EPA details a rollover equity transaction in which Plaintiffs were to contribute rollover equity in exchange for rollover units in Elite, and to sell the remaining equity to Buyer and Holdings/Cadrex.[30] In return, Plaintiffs were to receive an Initial Cash Purchase Price of over $90 million.[31]

Additionally, EPA Section 2.8(a) provides for an Earnout Payment that "Seller shall be eligible to receive" post-Closing, according to the following provisions:

> Within thirty (30) days following the delivery of the audited consolidated financial statements of the Company for the twelve (12)-month period ended December 31, 2023, but in any event not later than June 1, 2024, Buyer shall prepare and deliver to the Seller a statement (the "Earnout Statement") setting forth the audited financial statements of the Company for the twelve (12)-month period ended December 31 2022, the audited financial statements of the Company for the twelve (12)-month period ended December 31, 2023, the 2022 EBITDA, the 2023 EBITDA and a determination of any Earnout Payment to be paid to the Seller on the basis of such calculation in accordance with the terms and conditions of this Section 2.8. . . .[32]

---

[28] *Id.* ¶ 11.

[29] Underlined and capitalized words appear as they do in the EPA. The EPA labels "Buyer", "Seller", and "Holdings" consistent with this opinion, and Mr. Conlon is additionally identified as the "Stockholder". Elite is the "Company".

[30] Compl. ¶ 13; EPA § 2.1.

[31] *Id.* ¶ 14; MTD at 5. The EPA details the calculation of the Initial Cash Purchase Price. *See* EPA, § 1.1. Plaintiffs characterize the Earnout Payment as *a part* of the "total Cash Consideration" Plaintiffs were to receive *in addition* to the defined Initial Cash Purchase Price. Opp'n MTD at 3. However, "cash consideration" is not defined (or capitalized) in the EPA and appears only in the definition of "Purchase Price:
The aggregate cash consideration . . . shall be an aggregate amount equal to the Initial Cash Purchase Price and the Earnout Payment (if any)." EPA § 2.2(a).

[32] EPA § 2.8(a).

The Earnout Payment was to be calculated by:

> (1) averaging the 2022 and 2023 EBITDA of Elite, (2) multiplying that number by 6 (if the 2023 EBITDA was less than 110% of the 2022 EBITDA) or 6.5 (if the 2023 EBITDA was more than 110% of the 2022 EBITDA), and (3) subtracting $127,825,000.[33]

The "2022 EBITDA" is defined in the EPA as the "Adjusted EBITDA of the Company for the twelve (12)-month period ending December 31, 2022 (the '2022 Earnout Period')."[34] The "2023 EBITDA" is defined similarly as the "Adjusted EBITDA of the Company for the twelve (12)-month period ending December 31, 2023 (the '2023 Earnout Period')."[35] The "Average EBITDA" is the sum of the 2022 EBITDA and the 2023 EBITDA divided by two.[36]

The Earnout Payment is a "possible additional payment . . . if Elite achieved certain financial milestones between the time of Closing and the end of calendar year 2023 (the Earnout Period)."[37]

To that end, Section 2.8(e) provides that Plaintiffs:

> [A]cknowledge and agree that the Board of Managers (or any similar governing body) of Holdings and/or any of their respective Affiliates may make from time to time such business decisions and take such actions as it deems reasonably appropriate in the conduct of the business of Holdings and/or any of their respective Affiliates following the Closing. Notwithstanding the foregoing, Holdings and the Buyer agree that they shall act in good faith and shall not take (and shall cause their controlled Affiliates not to take) any action or engage in any conduct with the purpose of circumventing the achievement of any Earnout Payment, artificially decreasing the 2022 EBITDA or 2023 EBITDA, or otherwise hindering or diminishing the Seller's ability to earn or receive the Earnout Payment.[38]

Section 2.8(e) addresses potential disputes over the Earnout Statement:

---

[33] Compl. ¶ 14 (citing EPA § 2.8(d)).
[34] EPA § 2.8(d).
[35] *Id.*
[36] *Id.*
[37] MTD at 5.
[38] EPA § 2.8(e). See also *id.*, § 1.1 ("'Affiliate' of any particular Person means any other Person controlling, controlled by or under common control with such Person, where 'control' means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise."). "Person" includes natural persons, business entities, and other entities. *Id.*

The Seller shall have sixty (60) calendar days following receipt of the Buyer's Earnout Statement to dispute any item or calculation set forth in the Earnout Statement, after which time any undisputed items shall be final, conclusive and binding on the Parties. If the Seller timely disputes any items or calculation set forth in the Earnout Statement, Buyer and the Seller shall, for a period of thirty (30) calendar days thereafter, use commercially reasonable and good faith efforts to attempt to resolve their differences in respect thereof; provided, that at any time after such thirty (30) day period, either Buyer or the Seller may elect to have the Valuation Firm resolve any such items that remain in dispute, in which event Buyer and the Seller will instruct the Valuation Firm to deliver within forty-five (45) calendar days after appointment (or such other time period mutually agreed upon by Buyer and the Seller) a written statement setting forth its determination, which statement shall be final, conclusive and binding on the Parties, absent manifest error, and shall be enforceable as an arbitration award in any court of competent jurisdiction under the Federal Arbitration Act or its state law equivalents. . . . The Valuation Firm shall determine only those items submitted to the Valuation Firm and its determination will be based upon and consistent with the terms and conditions of this Agreement. The determination by the Valuation Firm will be based solely on presentations with respect to such disputed items by Buyer and the Seller to the Valuation Firm and not on the Valuation Firm's independent review….[39]

The Valuation Firm is identified elsewhere in the EPA as RSM US LLP.[40]

### 3. Subsequent Events and Litigation History

As stated, CORE and Holdings/Cadrex had acquired Elite during a period of rapid portfolio growth.[41] Two other companies acquired by Defendants at this time are relevant to this civil action.

In August 2021, CORE and Holdings/Cadrex acquired CGI Automated Manufacturing, located in Romeoville, Illinois ("Cadrex-Romeoville").[42] Plaintiffs state that the facility "was (and for quite some time had been) lacking in sufficient customer orders and business to sustain

---

[39] *Id.* § 2.8(c).
[40] *Id.* § 2.4(b).
[41] *See* Tim Heston, *Precision Sheet Metal Behemoth Cadrex Manufacturing Solutions' perspective on consolidation*, THE FABRICATOR (June 7, 2023), https://www.thefabricator.com/thefabricator/article/shopmanagement/2023-fab-40-precision-sheet-metal-behemoth-cadrex-manufacturing-solutions-perspective-on-consolidation (noting that CORE and Holdings/Cadrex were "on the acquisition trail—big time.").
[42] Compl. ¶ 8.

7

that facility. The facility allegedly was plagued with ineptitude and inefficient production techniques."[43]

In July 2022 CORE and Holdings/Cadrex acquired Tenere, Inc. ("Tenere"), a large sheet metal fabricating manufacturer with locations in Wisconsin, Colorado, and Mexico.[44] Plaintiffs assert that "Tenere lacked, *inter alia*, creative design capabilities, quick turnarounds, their own product lines, and open capacity, while burdened by an inflated overhead that materially and negatively impacted its profits."[45]

Certain personnel changes occurred after the Tenere acquisition. Two former Tenere executives moved into leadership roles with Defendants, resulting in Mr. Conlon reporting to Brian Steel, who became the CEO of Holdings/Cadrex, and Mike Fuller, who became the President of the Cadrex Integrated Solutions Division, which had "subsumed Elite."[46]

Next, Mr. Conlon's role changed from President of Elite to Vice President.[47] Plaintiffs state that Mr. Steel "assured Conlon that the change in title would be in name only, and that Conlon would continue to have all of the responsibilities and duties commensurate with those of a President and as detailed in the Employment Agreement."[48] However, Plaintiffs state that the change actually "stripped [Mr. Conlon] of the autonomy and authority to operate Elite as he had prior to the acquisition."[49]

---

[43] *Id.* ¶ 35.
[44] *Id.* ¶ 27; *Tenere Inc is now Cadrex*, https://www.cadrex.com/tenere (last visited Apr. 15, 2024).
[45] *Id.*
[46] Opp'n MTD at 5 (citing Compl. ¶ 28). *See also* Tim Heston, *Precision Sheet Metal Behemoth Cadrex Manufacturing Solutions' perspective on consolidation*, THE FABRICATOR (June 7, 2023), https://www.thefabricator.com/thefabricator/article/shopmanagement/2023-fab-40-precision-sheet-metal-behemoth-cadrex-manufacturing-solutions-perspective-on-consolidation (describing the internal Cadrex two-division structure as Cadrex Integrated Solutions, ("for finished or near-finished goods"), and Cadrex Mechanical Solutions, ("for precision components and light subassemblies").
[47] Compl. ¶ 29.
[48] *Id.*
[49] Pl. Opp'n to MTD/MTS at 6 (citing Compl. ¶ 29).

Finally, Ron Sommers, Elite's Vice President of three years, resigned his position.[50] Plaintiffs assert that this change "was particularly detrimental to Elite as, due to [Mr.] Sommers' work, Elite saved on average $1 million in costs per year on purchased items."[51] Mr. Sommers' position remained vacant for several months "despite repeated requests from [Mr.] Conlon" and "in defiance of Elite's obligation to allow Conlon to have the authority and ability to act as its President . . . ."[52]

Over the next several months, Plaintiffs state that other changes within the Holdings/Cadrex portfolio negatively affected Elite, its EBITDA, and consequently the potential Earnout Payment. A February 2023 decision directed "that a portion of Elite's facilities, equipment and personnel was going to be diverted and utilized to fulfill the customers' orders and backlog of Tenere rather than Elite's customer orders/backlog."[53] In May 2023, Plaintiffs claim that Elite's resources were again "diverted" when Defendants "planned to close Cadrex-Romeoville and use Elite's facilities, equipment, and personnel to fulfill Cadrex-Romeoville customer orders, which would be placed ahead of Elite's customer orders. Moreover, a number of poor-quality personnel from the Cadrex/Romeoville facility were transferred to Elite without Conlon's knowledge, consent, or approval."[54]

After repeatedly questioning "how Elite would get credit for the additional work being done for a different entity and express[ing] concern that taking on that work would necessarily harm Elite's ability to meet its obligations to its own customers," Mr. Conlon alleges that Mr.

---

[50] Compl. ¶ 30.
[51] Id.
[52] Id.
[53] Id. ¶ 31.
[54] Opp'n MTD at 7 (citing Compl. ¶ 36).

"Steel, Buyer, Holdings/Cadrex and CORE reacted in a punitive fashion."[55] Ultimately, in July 2023, Elite terminated Mr. Conlon and "proffered no business rationale" for doing so.[56]

Plaintiffs filed a three-count Complaint with this Court on November 16, 2023.[57] As noted, Count III for Tortious Interference with the Employment Agreement against Holdings/Cadrex and CORE was dismissed without prejudice via stipulation and order on April 2, 2024;[58] and Defendants' Motion to Dismiss Count I was denied on May 6, 2024.[59]

Count II alleges Tortious Interference with the EPA against CORE, for which Plaintiffs seek judgment in an amount to be determined at trial along with interests and costs, as well as punitive damages "as a result of CORE's wanton and malicious conduct" in an amount to be determined at trial.[60]

### III.    PARTIES' CONTENTIONS

#### A. DEFENDANTS

Defendants assert that Count II should be dismissed under the affiliate privilege, which "immunizes CORE from tort liability for Holdings/Cadrex and Buyer's purported contractual breach of the EPA."[61]

#### B. PLAINTIFFS

Plaintiffs counter, maintaining that Count II should be permitted to proceed because Plaintiffs have plead all elements of a tortious interference with contract claim.[62] Further,

---

[55] Compl. ¶¶ 37, 40.
[56] *Id.* ¶ 45.
[57] D.I. No. 1.
[58] D.I. No. 21.
[59] D.I. No. 34.
[60] Compl. ¶¶ 56-62.
[61] MTD at 22. Defendants had also argued that Count II should be stayed as premature based on their contention that Count I was premature. Because the Court denied Defendants' Motion to Dismiss or Stay Count I, this argument is now moot. *See* Motion Transcript Held on May 6, 2024 38:15-16 (hereinafter "Tr.") (D.I. No. 38), "[T]here are facts sufficient to support a breach of contract claim."
[62] *Id.* at 20.

Plaintiffs argue that CORE is not shielded from liability for tortious acts committed in bad faith by Delaware's "limited" affiliate privilege.[63]

## IV.   STANDARD OF REVIEW

When reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must "view the complaint in the light most favorable to the non-moving party, accepting as true all well pleaded allegations and drawing reasonable inferences that logically flow from them," but "decline . . . to accept conclusory allegations unsupported by specific facts or to draw unreasonable inferences in favor of the non-moving party."[64]  "Even vague allegations are considered well-pleaded if they give the opposing party notice of a claim."[65]

"Dismissal is warranted where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[66]  But, if the Court engages the standards described and finds the claimant may recover, the Court must deny the motion to dismiss.[67]

## V.   DISCUSSION

Delaware has adopted the Restatement (Second) of Torts' formulation of tortious interference with contract:[68]

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.[69]

---

[63] *Id.* at 27.
[64] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).
[65] *Veney v. United Bank*, 2017 WL 3822657, at *2 (Del. Super. Aug. 31, 2017).
[66] *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Aug. 20, 2004).
[67] *Riverside Fund V, L.P. v. Shyamsundar*, 2015 WL 5004924, at *3 (Del. Super. Aug. 17, 2015); *Spence v. Funk & Commc'n Consultants, Inc.*, 396 A.2d 967, 968 (Del. 1978).
[68] *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at *25 (Del. Ch. Oct. 7, 2019).
[69] RESTATEMENT (SECOND) OF TORTS § 766 (1979).

11

"Reframed as elements, a plaintiff must plead: '(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury.'"[70]

The "non-straightforward element" of the claim is justification.[71] This is because "some types of intentional interference with contractual relations are a legitimate part of doing business."[72] Therefore, courts must balance claims for tortious interference "against a party's legitimate right to compete."[73] This involves "a 'complex normative judgment relating to justification' based on the facts of the case and 'an evaluation of many factors.'"[74] Those factors, from the Restatement, are:

(a) [T]he nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.[75]

Plaintiffs argue that CORE is liable for tortious inference because, as owner of Holdings/Cadrex and Buyer, CORE knew about the EPA "and the obligations of Holdings/Cadrex and Buyer with respect to Elite's 2022 and 2023 EBITDA in particular"; that CORE "intentionally and unjustifiably assisted and induced" the other Defendants to engage in the activities alleged which, "in turn, caused and induced Holdings/Cadrex and Buyer to breach"

---

[70] *Bandera,* 2019 WL 4927053, at *25 (quoting *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal quotation marks omitted)).
[71] *Id.*
[72] *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014).
[73] *Agilent Techs. v. Kirkland*, 2009 WL 119865, at *8 (Del. Ch. Jan. 20, 2009).
[74] *Bandera,* 2019 WL 4927053, at *25 (quoting *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 589 (Del. Ch. 1994) (internal citations omitted)).
[75] RESTATEMENT (SECOND) OF TORTS § 766 (1979).

the EPA.[76] Plaintiffs allege that CORE was "motivated to reduce the EBITDA of Elite, to specifically and in bad faith injure Plaintiffs by intentionally diminishing the 2022 and 2023 EDITDA and, in turn, to enhance and improve the value of CORE and its other portfolio companies who benefitted from the use of Elite's facilities and personnel."[77] Plaintiffs claim Elite was damaged by not receiving "adequate credit or compensation" for diverted resources used to "advance CORE's separate interests in Tenere and Cadrex-Romeoville", and by the "fracturing [of] Elite's management—all of which was intended to, and had the direct and proximate result of, diminishing Elite's 2022 and 2023 EBITDA."[78]

Defendants respond that Count II should be dismissed because CORE is immunized from tort liability of the actions of Holdings/Cadrex and Buyer under Delaware's affiliate privilege, so Plaintiffs cannot therefore state the "without justification" element of their claim.

## A. THE AFFILIATE PRIVILEGE

In Delaware, a "respect for corporate separateness" means that the state "maintains a role for tortious interference even when one entity controls another . . . The result is a limited affiliate privilege that protects a parent corporation that 'pursues lawful action in the good faith pursuit of [the subsidiary's] profit making activities.'"[79] The privilege, however, is qualified, and:

> [D]oes not protect non-party affiliates that induce breaches in bad faith. Delaware courts are reluctant to find bad faith because affiliate interference often is a legitimate business strategy. When evaluating a plaintiff's claim of unjustified interference, therefore, Delaware courts must balance the important policies served by a claim for tortious interference with contract against the similarly important policies served by the corporate form. That balance is struck to avoid endorsing haphazard *respondeat superior* theories and faulty approaches to corporate veil

---

[76] Compl. ¶¶ 57-58.
[77] *Id.* ¶ 59.
[78] *Id.* ¶ 60.
[79] *Bandera,* 2019 WL 4927053, at *26 (quoting *Shearin,* 652 A.2d at 590).

piercing. The doctrine also serves to prevent judicial frustration of inter-firm consultation on matters of commercial significance.[80]

Defendants cite *Buck v. Viking Holding Mgmt. Co. LLC* for the proposition that, to "escape the affiliate privilege, Plaintiffs must plead facts sufficient to rebut the presumption that CORE was 'pursuing . . . legitimate profit seeking goals in good faith' and instead plead that Defendants' '*sole* motive in interfering was bad faith to injure plaintiffs.'"[81] To that end, Defendants argue that Plaintiffs' "Complaint contains a fatal admission in this regard—namely, that CORE was, at least in part, 'motivated . . . to enhance and improve the value of CORE and its other portfolio companies.'"[82] Defendants contend that Plaintiffs therefore "concede that CORE's *sole* motive was not to injure Plaintiffs in bad faith" if "CORE induced Holdings/Cadrex or Buyer to take any action that breached the EPA (they did not)".[83]

Defendants allege that Plaintiffs' "conclusory" allegations that CORE's conduct was "'unjustified and contrary to Elite's best interests' [are] a far cry from pleading the type of bad faith interference Delaware Courts require."[84]

Plaintiffs counter that the affiliate privilege "does not insulate CORE from liability for tortiously interfering with the EPA because CORE's improper actions were diametrically *not* in the good faith pursuit of Elite's profit-making activities."[85]

**B. CORE'S CONDUCT IS PROTECTED BY THE PRIVILEGE.**

The parties disagree as to which entity's legitimate profit-making activities CORE must have been pursuing in order to claim the protection of the affiliate privilege. Plaintiffs insist that

---

[80] *Buck v. Viking Holding Mgmt. Co. LLC*, 2021 WL 673459, at *6 (Del. Super. Feb. 22, 2021) (internal citations and quotations omitted).
[81] MTD at 22-23 (quoting *Buck,* 2021 WL 673459, at *6 (internal citations omitted; emphasis in original)).
[82] MTD at 23 (citing Compl. ¶ 59).
[83] *Id.*
[84] *Id.* (quoting Compl. ¶ 60).
[85] Opp'n MTD at 22-23 (emphasis supplied).

14

entity is Elite. Defendants contend that it is CORE's overall enterprise, of which Elite is one component. This divergence was clear at oral argument, when the Court questioned whether Plaintiffs could point to actions specifically alleged against CORE in the Complaint that would support its position. Plaintiffs' counsel responded: "CORE is the king. They're up here. And every other entity reports to CORE. They're the private equity firm and they control as most private equity firms do the directions of the portfolio companies. There's no mystery about how that works. CORE was instrumental."[86]

Plaintiffs further noted that, at the pre-discovery stage of the litigation:

[W]e don't have, you know, the behind-the-curtain view of what all was going on between these affiliated companies. What we know is that the parent companies directed the various affiliates; that we know. And what we know is the activities of the collective impacted the one entity that they were required under the affiliate privilege to protect, which was Elite.[87]

. . .

I think you can make a reasonable inference that these portfolio companies that are wholly owned did not go off book. They were taking direction from their owners. You have to—that's a fair and reasonable assumption. And these are the activities that occurred. And it benefitted CORE and its other portfolio companies to the detriment of Elite. And that's when you take a look at what occurred here. That's exactly what I think you can reasonably infer. We will not have until we have discovery . . . [for a] picture of the direction being given. But it's reasonable to infer that portfolio companies typically don't go off book from what the parent wants them to do.[88]

In response, Defendants' counsel reiterated Defendants' position that there are inadequately plead facts to rebut the presumption of the affiliate privilege or to show that CORE was motivated by malicious intent, as articulated in *Bandera*. Rather, CORE's operation of "its

---

[86] Tr. 21:5-11.
[87] Tr. 26:10-20.
[88] Tr. 27:2-16. The Court responded that "in Delaware we also assume that they're not acting in violation of their fiduciary duties and without corporate separateness too. We don't make the reasonable inference that they're not abiding by the corporate formalities. And I generally don't take that as a reasonable inference." Tr. 27:17-23.

15

multiple businesses for the betterment of the overall enterprise" comprised a legitimate purpose to achieve "permissible financial goals . . . ."[89]

The difficulty in determining which entity's legitimate profit-making activities should be the focus of the inquiry here is that both parties to the contract at issue are affiliates of CORE. However, as explained in *NAMA*, the rationale behind the affiliate privilege is protecting "the significant economic interest of a parent corporation in its subsidiary" balanced *against* "the interests of third parties in *their* contractual relationships with the subsidiary."[90] In this context, it is clear that CORE's affiliation with Buyer and Holdings/Cadrex underpins whether CORE's actions are privileged or not. Buyer and Holdings/Cadrex are the "affiliate" in this analysis, not Elite. Rather, Elite holds the position of "third party" to the contract in the evaluation of whether CORE was pursuing the legitimate profit-making activities of its affiliate—Buyer and Holdings/Cadrex.

Elite is not unrelated to CORE. Pursuant to the EPA, Elite is a subsidiary of Buyer. Buyer is a subsidiary of Holdings/Cadrex. Holdings/Cadrex is a subsidiary of CORE. The "respect for the corporate form" inherent in the affiliate privilege indicates that CORE may claim the privilege as long as CORE is pursuing the legitimate activities of Buyer and Holdings/Cadrex because Elite is a subsidiary of a CORE subsidiary. Moreover, CORE can pursue activities that reasonably include decisions to redirect resources among *their* subsidiaries, including Elite. That Plaintiffs were injured by CORE's legitimate business decisions in the pursuit of Buyer and Holdings/Cadrex's profit-making activities is incidental *unless* CORE's sole motive was to injure Elite Corp. and Conlon. Otherwise, CORE's actions are privileged.

---

[89] Tr: 29:6-8.

[90] *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014) (citing *Shearin*, 652 A.2d 590) (emphasis added).

16

The Court notes, however, that Defendants overemphasize the *factor* of CORE's motivation in the analysis. "Sole motive" in the context of a tortious interference claim was first discussed in *WaveDivision Holdings, LLC v. Highland Capital Management, L.P.*[91] The Supreme Court later clarified its holding with respect to the factors listed in Restatement Section 766 (see above), stating "*WaveDivision* did not hold that a tortious interference claim requires the plaintiff to allege that the tortfeasor's 'sole motive' was to interfere with the plaintiff's contract."[92] Rather:

> [T]he alleged tortfeasor's motive is one factor to be weighed in determining whether the improper interference element of a tortious interference claim has been shown. As we explained: "[t]he defense of justification does not require that the defendant's proper motive be its sole or even its predominate motive for interfering with the contract. Only if the defendant's *sole* motive was to interfere with the contract will *this factor* support a finding of improper interference. . . . Viewed in this context, *WaveDivision* should not be understood as absolutely precluding a tortious interference claim when the alleged tortfeasor can identify one proper motive among many unseemly ones. Motive, even after *WaveDivision*, is simply one of seven factors to be considered when determining whether interference was improper."[93]

As only one factor in the analysis, Plaintiffs correctly rely on the "leading case" of *NAMA* for the proposition that the "dynamics" of the parent-subsidiary relationship must be considered along with the motive.[94]

*Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, also heavily cited by Plaintiffs, noted that claims differentiating between permissible efficient breaches and tortious interference must meet "a high bar that permits such claims to proceed only when facts are pled that suggest that the

---

[91] *WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168 (Del. 2012).
[92] *Cousins v. Goodier*, 283 A.3d 1140, 1165 (Del. 2022).
[93] *Id.* at 1166-67 (quoting *WaveDivision,* 49 A.3d at 1174 (emphasis supplied)).
[94] Opp'n MTD at 24 (citing *NAMA,* 2014 WL 6436647, at \*29-30):
> While observing that when a "desire to interfere with the other's contractual relations" is "the sole motive, the interference is almost certain to be improper," [*NAMA*] also explains "[t]he desire to interfere with the other's contractual relations *need not . . . be the sole motive*" and that "even if it is only a casual motive it may still be significant in some circumstances."

parent acted with scienter, in the sense that it knowingly assisted the affiliate in committing a wrongful act against another."[95]

Plaintiffs argue "the Complaint unequivocally pleads that CORE has done precisely what the *Allied Capital* and [*NAMA*] line of cases excludes from the limited affiliate privilege."[96] Specifically, Plaintiffs contend that CORE "orchestrated and directed business activities by its business affiliates and portfolio companies to utilize (and indeed convert) Elite's facilities and resources" in order to "intentionally sacrifice Elite and its constituencies for their own benefit, which is the essence of bad faith."[97]

However, while these allegations may be sufficient to state a claim for breach of the EPA against Buyer and Holdings/Cadrex under Count I, that CORE may have "orchestrated and directed" a reallocation of resources among its affiliates does not demonstrate the bad faith necessary to defeat the affiliate privilege. Indeed, as *NAMA* explained:

> [A] court must accept that the parent may intend for the subsidiary to breach the contract, and such an intent will not support imposing liability for tortious interference if the breach is consistent with the good faith pursuit of the subsidiary's legitimate profit-making activities, such as through an efficient breach of contract.[98]

Bad faith, on the other hand, has been demonstrated "where the parent corporation took action that both induced a breach of contract and rendered the subsidiary unable to satisfy its contractual obligations."[99] While "[a]llegations of insolvency or inability to locate assets are not the only manner of successfully pleading bad faith," a plaintiff must nevertheless "allege behavior beyond a failure to comply with the terms of a contract to seek remedies beyond those

---

[95] *Allied Cap. Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1025–26 (Del. Ch. 2006).
[96] Opp'n MTD at 26.
[97] *Id.* at 27.
[98] *NAMA,* 2014 WL 6436647, at *29-30 (citing *Bhole*, 67 A.3d at 453).
[99] *Id.* at 30 (citing *Am. Gen. Hldgs.,* 2013 WL 5863010, at *13; *WP Devon Assocs. v. Hartstrings, LLC*, 2012 WL 3060513, at *4 (Del. Super. July 26, 2012); and *Allied Capital*, 910 A.2d at 1024)).

contemplated by the contractual terms governing its breach. An escalated showing of bad faith is particularly necessary when the entities are . . . closely intertwined . . . ."[100]

Plaintiffs ask the Court to "reasonably infer" tortious conduct by CORE based on the alleged contractual breach by its subsidiary because "CORE is king." This does not allege behavior beyond a failure to comply with contract terms and does not supply a factual basis with which the Court can infer tortious interference by CORE outside of the protection of the affiliate privilege. Accordingly, Plaintiffs have failed to state a claim for tortious interference with contract against CORE.

## VI.    CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss Count II of the Complaint is **GRANTED**.

Dated: August 8, 2024
Wilmington, Delaware

/s/ Eric M. Davis
Eric M. Davis, Judge

cc:  File&ServeXpress

---

[100] *Am. Gen. Hldgs.*, 2013 WL 5863010, at *13 n.89.